[No. S111985. June 20, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
GERARDO PEREZ, Defendant and Appellant.

1220

**COUNSEL**

Michael Ian Garey for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Garrett Beaumont, David Delgado-Rucci, Steven T. Oetting and Lise Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WERDEGAR, J.**—A defendant is arrested in possession of methamphetamine precursors he planned to sell. May the defendant be convicted of aiding and abetting the prospective buyer's possession of precursors with the intent to manufacture methamphetamine? We conclude he may not. In the alternative, may the defendant be convicted directly of possessing precursors with the intent to manufacture methamphetamine? (Health & Saf. Code, former § 11383, subd. (c)(2).)[1] Again, we conclude he may not. We therefore affirm the Court of Appeal's reversal of defendant Gerardo Perez's section 11383(c)(2) conviction.

### PROCEDURAL AND FACTUAL BACKGROUND

An undercover police officer observed a transaction consistent with drug-related activities between individuals in Perez's car and those in a van. The police initiated a traffic stop. During a consensual search of Perez's car, an officer found a small bag containing marijuana and two plastic shopping bags, one containing approximately 10 pounds of red phosphorus and the other approximately five pounds of powdered iodine. Officers also found a pair of jeans stained with a yellow dye, later determined to be hydrogen iodide, a component of hydriodic acid. Perez had $717 in cash on his person.

At trial, a forensic scientist testified that one method of manufacturing methamphetamine involves combining a common cold medicine, pseudoephedrine, with hydriodic acid. In turn, hydriodic acid can be produced by mixing red phosphorus and iodine with water. When asked why a person would possess red phosphorus and iodine together, the expert replied, "I see no other purpose for it than to make hydriodic acid." An experienced narcotics officer testified that it is the rule, rather than the exception, for each of the ingredients used in methamphetamine manufacturing to be provided by a different source.

Perez did not testify at trial. At the scene, he claimed ownership of the hydrogen-iodide-stained jeans. In a statement to police, he admitted the chemicals found in the car belonged to him. He told officers that he purchased the chemicals for $350 from a woman known to him as "Vicky," intending to take them to Pasadena to sell for $400 to a man known to him as "Antonio." He had purchased these chemicals in similar amounts on one other occasion and knew they were used in the manufacture of methamphetamine.

---

[1] All subsequent unlabeled statutory references are to the Health and Safety Code. Former section 11383, subdivision (c)(2) (Stats. 1995, ch. 571, § 1, p. 4418) is hereafter referred to as section 11383(c)(2). The section was amended in 2003, but the amendments are not relevant to this opinion.

Perez was charged with possessing hydriodic acid precursors with the intent to manufacture methamphetamine. (§ 11383(c)(2).)[2] The People proceeded under two theories: that Perez was liable as a direct perpetrator because he possessed the precursors and personally intended to manufacture methamphetamine or, in the alternative, that Perez was liable as an aider and abettor because he possessed the precursors with the intent to sell them to another person to be used in manufacturing methamphetamine. During closing argument, the prosecution argued, over Perez's objection, that aiding and abetting liability required proof only that Perez possessed the hydriodic acid precursors with the knowledge that someone else would use them to manufacture methamphetamine. The trial court prevented defense counsel from arguing that liability for aiding and abetting required proof of a completed attempt or offense, and denied a proposed special instruction on this point, ruling that "[t]here's no need for a completed crime under the statute." Instead, in accordance with the prosecution's theory of the case, the court gave CALJIC Nos. 3.00 and 3.01, standard instructions on aiding and abetting.[3] A jury convicted Perez of violating section 11383(c)(2).

The Court of Appeal reversed. It held that aiding and abetting liability required proof that a predicate crime had been committed separate and apart from the actions of the aider and abettor, and that in the absence of proof of such a crime the trial court erred by instructing the jury on aiding and abetting.

---

[2] "Any person who, with intent to manufacture methamphetamine or any of its analogs . . . possesses hydriodic acid or any product containing hydriodic acid is guilty of a felony . . . ." (§ 11383(c)(2).) At the time of the offenses, section 11383(c)(2) applied to possession of red phosphorus and iodine as well. Prior to amendment in 2003, section 11383, subdivision (f) equated possession of hydriodic acid precursors with possession of hydriodic acid. "Section 11383(f), therefore, simply expanded the scope of section 11383(c)(2) to prohibit possession of red phosphorus and iodine with intent to manufacture methamphetamine." (*People v. McCall* (2004) 32 Cal.4th 175, 189 [8 Cal.Rptr.3d 337, 82 P.3d 351].) The 2003 amendments to the statute made the possession of red phosphorus and iodine with intent to manufacture methamphetamine expressly illegal under section 11383, subdivision (f), rather than section 11383(c)(2). (Stats. 2003, ch. 619, § 1.)

[3] These instructions respectively provided:

"Persons who are involved in committing a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation is equally guilty. Principals include: [¶] 1. Those who directly and actively commit the act constituting the crime, or [¶] 2. Those who aid and abet the commission of the crime." (CALJIC No. 3.00.)

"A person aids and abets the commission of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice aids, promotes, encourages or instigates the commission of the crime. [¶] A person who aids and abets the commission of a crime need not be present at the scene of the crime. [¶] Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting. [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting." (CALJIC No. 3.01.)

We granted review to clarify the scope of aiding and abetting liability, as well as the scope of section 11383. Can conviction on an aiding and abetting theory stand absent proof of a crime by a second party? If not, does section 11383(c)(2) directly criminalize possession of controlled substances with the intent that someone else manufacture methamphetamine? Put differently, is possession of hydriodic acid precursors with the intent that someone else use them to manufacture methamphetamine criminal, under either an accomplice or direct liability theory?

DISCUSSION

### I. *Accomplice Liability: Aiding and Abetting*

We consider first whether one can be guilty of aiding and abetting absent proof of criminal conduct by some direct perpetrator. We begin with the plain language of Penal Code section 31, which governs aiding and abetting liability. The statute extends criminal liability as principals in a crime to "[a]ll persons concerned in the commission of a crime," and all those who "aid and abet in its commission." As this language makes plain, the commission of a crime is a prerequisite for criminal liability. If the defendant himself commits the offense, he is guilty as a direct perpetrator. If he assists another, he is guilty as an aider and abettor. It follows, therefore, that for a defendant to be found guilty under an aiding and abetting theory, someone other than the defendant must be proven to have attempted or committed a crime; i.e., absent proof of a predicate offense, conviction on an aiding and abetting theory cannot be sustained.

We analyzed aiding and abetting liability in detail in *People v. McCoy* (2001) 25 Cal.4th 1111 [108 Cal.Rptr.2d 188, 24 P.3d 1210]. There, we explained that an aider and abettor's guilt "is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state." (*Id.* at p. 1117, italics omitted.) " '[O]nce it is proved that "the principal has caused an *actus reus*, the liability of each of the secondary parties should be assessed according to his own *mens rea*." ' " (*Id.* at p. 1118, quoting Dressler, Understanding Criminal Law (2d ed. 1995) § 30.06[C], p. 450.) Thus, proof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime. (See *McCoy*, at p. 1117.)

██ Consistent with these principles, we have explained that "[a]ccomplice liability [including aider and abettor liability] is 'derivative,' that is, it results from *an act by the perpetrator* to which the accomplice contributed." (*People v. Prettyman* (1996) 14 Cal.4th 248, 259 [58 Cal.Rptr.2d 827, 926 P.2d 1013], italics added.) This description squares with the historical understanding of the doctrine, recounted by Judge Hand in *United States v. Peoni* (2d Cir. 1938) 100 F.2d 401. As early as the 14th century, English law punished those who " 'procured, counselled, commanded or abetted' the felony." (*Id.* at p. 402, quoting 2 Pollock & Maitland, The History of English Law Before the Time of Edward I (2d ed. 1909) p. 509.) But such liability hinged on the commission of a crime; thus, "[t]he man who has commanded or counselled a murder has committed no crime until there has been a murder; but when the murder is committed he is guilty of it." (2 Pollock & Maitland, p. 509.) Though the subsequent development of the law of attempt has amended this principle by allowing liability for substantial steps that fall short of achieving the criminal end, it has not diluted the requirement that there be a second actor engaged in criminal conduct whom the aider and abettor aids and abets.

The People argue that aiding and abetting liability does not require proof of a completed crime. They further contend the Court of Appeal erred by relying on *People v. Parra* (1999) 70 Cal.App.4th 222 [82 Cal.Rptr.2d 541], which, they assert, misread our decision in *People v. Montoya* (1994) 7 Cal.4th 1027 [31 Cal.Rptr.2d 128, 874 P.2d 903].

██ The first half of this argument is correct: proof of an *attempt* by a direct perpetrator is sufficient for purposes of aiding and abetting liability. If a direct perpetrator is thwarted and guilty only of an attempt, an aider and abettor may still be guilty of aiding and abetting the attempt. (See, e.g., *People v. Lee* (2003) 31 Cal.4th 613, 623–624 [3 Cal.Rptr.3d 402, 74 P.3d 176]; *People v. Mendoza* (1998) 18 Cal.4th 1114, 1123 [77 Cal.Rptr.2d 428, 959 P.2d 735].)

The second half of the argument is incorrect: nothing in *People v. Parra, supra,* 70 Cal.App.4th 222, or in the Court of Appeal's decision below required proof of a completed crime. In *Parra,* at page 227, footnote 5, the Court of Appeal rejected the notion that a defendant could be convicted of aiding and abetting possession of cocaine with intent to sell where the defendant possessed cocaine with the intent to transfer it to a second person who would sell it. The Court of Appeal reasoned that aiding and abetting liability could not apply because "the crime of the alleged recipient/seller was

never completed and the liability of aider and abettor attaches only when all substantive elements of the predicate offense are satisfied. (See *People v. Montoya*[, *supra,*] 7 Cal.4th [at pp.] 1040–1041.)" This was an entirely correct statement of the law: aiding and abetting liability cannot attach unless the substantive elements of a predicate offense are met. This requirement may be satisfied by proof of an attempt, but contrary to the People's argument, nothing in *Parra* or in the Court of Appeal's opinion here indicated otherwise. Nor did *Parra* misread *Montoya*, a case that examined when in the course of a burglary aiding and abetting liability could attach. *Parra* correctly recognized what was implicit in *Montoya*—aiding and abetting liability requires the completion of an independent substantive offense.

The real issue in this case is not whether proof of an attempted, rather than a completed, crime by the direct perpetrator is sufficient, but whether either is necessary. At trial, the People persuaded the court to give aiding and abetting instructions despite the absence of proof of either a completed crime *or* an attempt. The People eschewed any attempt theory, arguing instead that by intending to sell the hydriodic acid precursors to Antonio, Perez aided and abetted Antonio's manufacture of methamphetamine. Whether the theory was that Perez intended to aid and abet Antonio's actual manufacture of methamphetamine (§ 11379.6, subd. (a)) or to aid and abet Antonio's possession of hydriodic acid precursors with the intent to manufacture methamphetamine (§ 11383(c)(2)), no evidence established that Antonio ever violated, or attempted to violate, either statute. Without proof of a criminal act by Antonio to which Perez contributed, the prosecution could not convict Perez as an aider and abettor. (See *People v. Beeman* (1984) 35 Cal.3d 547, 561 [199 Cal.Rptr. 60, 674 P.2d 1318]; *People v. Cooper* (1991) 53 Cal.3d 1158, 1164 [282 Cal.Rptr. 450, 811 P.2d 742].)

■ Consequently, the trial court erred in instructing the jury on aiding and abetting. (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1129 [17 Cal.Rptr.2d 365, 847 P.2d 45] ["It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case"]; *People v. Singleton* (1987) 196 Cal.App.3d 488, 493 [241 Cal.Rptr. 842] [error to instruct on aiding and abetting absent proof of existence of direct perpetrator].) The court also erred in preventing defense counsel from arguing that the law of aiding and abetting, and CALJIC Nos. 3.00 and 3.01, require an independent attempted or completed crime. Under the facts of this case, Perez could be convicted as a direct perpetrator or not at all.

## II. *Direct Liability: Interpretation of Section 11383(c)(2)*

The People argue that section 11383(c)(2) criminalizes possession with intent that *anyone* manufacture methamphetamine, not just possession with

the intent to personally manufacture methamphetamine; hence, Perez was properly convicted as a direct perpetrator because he possessed hydriodic acid precursors with the intent that someone else use them to manufacture methamphetamine.

■ Preliminarily, we address Perez's contention that this argument has been forfeited. (See Cal. Rules of Court, rule 29.1(b)(3).) While this precise statutory issue was not part of the People's petition for review, we may consider all issues fairly embraced in the petition. (Cal. Rules of Court, rule 29(b)(1); *People v. Braxton* (2004) 34 Cal.4th 798, 809 [22 Cal.Rptr.3d 46, 101 P.3d 994].) The issue whether aiding and abetting liability requires proof that the elements of the predicate offense were committed by another, as we have determined it does, necessarily includes the issue whether the court's error in instructing the jury on aiding and abetting in the absence of such evidence was harmless. The jury was instructed on the requirements of section 11383(c)(2). If that section criminalizes possession of precursors with the intent that someone else manufacture methamphetamine, i.e., if it directly criminalizes the conduct tried under an aiding and abetting theory, then the court's error in instructing the jury on aiding and abetting would be harmless.

■ Turning to analysis of the statute, we begin with its language. Section 11383(c)(2) provides: "Any person who, *with intent to manufacture methamphetamine* or any of its analogs . . . possesses hydriodic acid or any product containing hydriodic acid is guilty of a felony . . . ." (Italics added.) The subdivision is one of a series of provisions that criminalize possession of precursors with the intent to manufacture specified controlled substances. (See § 11383, subds. (a)–(h).) The statute defines a crime with two elements: (1) possession of specified chemicals, and (2) criminal intent. (See CALJIC No. 12.09.4.) Here, the first element is conceded, the second disputed. While the People argue that the intent that anyone manufacture methamphetamine should suffice, Perez argues that a defendant must intend to participate personally in manufacturing methamphetamine. We agree with Perez.

■ First, the most sensible interpretation of the statute's plain language is that it requires intent to participate personally in manufacturing methamphetamine. The statute requires that a person have the "intent to manufacture methamphetamine," not the "intent that methamphetamine be manufactured." The use of an active, not passive, construction implies that the subject of the sentence, the defendant, must himself intend to participate in the manufacturing. Notably, when the Legislature has chosen to criminalize actions taken with the intent that someone else manufacture a controlled substance, it has used different language. Section 11104, subdivision (a) punishes "[a]ny . . . person . . . [who] sells, transfers, or otherwise furnishes any of the substances listed in subdivision (a) of Section 11100 with knowledge *or the intent that*

*the recipient will use the substance to unlawfully manufacture a controlled substance . . . ."* (Italics added; cf. 21 U.S.C. § 841(c)(1), (2) [separately punishing possession of listed chemicals "with intent to manufacture," and possession "knowing . . . that the listed chemical will be used to manufacture" a controlled substance].)

Second, we find the overall statutory context significant. (See *Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 977 [90 Cal.Rptr.2d 260, 987 P.2d 727].) In the case where A supplies precursors to B, who manufactures methamphetamine, there are in essence four sequential steps: (1) A possesses the precursors, with the intent to sell or transfer them for manufacture; (2) A sells or transfers them to B, with the knowledge or intent that B will manufacture; (3) B possesses them with the intent to manufacture; and (4) B manufactures. The Legislature has enacted a series of statutes that separately address these steps in the manufacturing chain. Section 11378 makes step 1, possession for sale, a felony punishable by 16 months, two years, or three years. (See Pen. Code, § 18.) Section 11104 makes step 2, sale or transfer with the knowledge or intent that the recipient will manufacture, a felony punishable by 16 months, two years, or three years, or a misdemeanor, depending on the nature of the precursors.[4] Section 11383 makes step 3, possession with the intent to manufacture, a felony punishable by two, four, or six years. (§ 11383(c)(2).) Section 11379.6 makes step 4, manufacturing, a felony punishable by three, five, or seven years. (§ 11379.6, subd. (a).)

These statutes generally reflect a legislative judgment that each successive step that moves closer to the actual manufacture of methamphetamine is a more serious crime meriting increased punishment—up to three years for step 1 or step 2, up to six years for step 3, and up to seven years for step 4. Indeed, the sale of methamphetamine and its manufacture originally were punished equally (*People v. Coria* (1999) 21 Cal.4th 868, 878–879 [89 Cal.Rptr.2d 650, 985 P.2d 970]), but in 1985 the Legislature passed section 11379.6 in order to " 'increase the penalties for those who illegally manufacture controlled substances.' " (*Coria*, at p. 879, italics omitted.)

Notably, the statute that covers possession *for sale* of methamphetamine precursors, section 11378, covers only certain precursors and does not extend to the hydriodic acid precursors Perez possessed.[5] The People would cure this

[4] See sections 11104, subdivision (a), 11100, subdivision (a)(33), (36) (sale or transfer of hydriodic acid or red phosphorus punishable as felony) and sections 11104, subdivision (b), 11107.1, subdivision (a) (sale or transfer of iodine punishable as misdemeanor).

[5] Section 11378 punishes possession for sale of the methamphetamine precursors listed in section 11055, subdivision (f), but that subdivision covers only phenylacetone, not red phosphorus, iodine, or even hydriodic acid. (§ 11055, subd. (f)(1)(A); *People v. Pierson* (2001) 86 Cal.App.4th 983, 991 [103 Cal.Rptr.2d 817].)

omission by arguing that even if Perez were guilty only of step 1, possession with the intent to sell, this would be enough to convict and punish him under section 11383(c)(2), which also penalizes step 3, possession with the intent to manufacture. But this interpretation would render possession with the intent to sell, the lesser included conduct, a more serious crime than the sale itself (step 2). (Compare § 11104, subd. (a) with § 11383(c)(2).) This is an anomalous result inconsistent with the overall statutory structure.

Third, to the extent the legislative history underlying section 11383 sheds any light, it indicates that the statute was aimed at shutting down the actual manufacturing laboratories, not the manufacturers' suppliers. Section 11383 was enacted as part of the 1972 California Uniform Controlled Substances Act (Stats. 1972, ch. 1407, § 3, p. 3024), and the original legislative history offers no insight into the section's intended scope. In 1987, the Legislature significantly expanded the range of precursor chemicals covered by adding subdivision (c) to the section. (Stats. 1987, ch. 424, § 1, p. 1589.) Documents in support of the amendment explained that, as written, section 11383 impaired raids on drug laboratories because it did not cover new chemical combinations criminal chemists had devised for manufacturing methamphetamine; thus, unless manufacturing had begun, no arrests could be made. (See Youth and Adult Correctional Agency, Enrolled Bill Rep. on Assem. Bill No. 2501 (1987–1988 Reg. Sess.) prepared for Governor Deukmejian (Sept. 1, 1987) p. 3; Attorney General John Van de Kamp, letter to Assemblywoman Lucy Killea [author of Assem. Bill No. 2501], Apr. 23, 1987.) The Attorney General sponsored the amendment to allow law enforcement once again to "shut down illegal labs before the manufacturing process begins. Illegal labs are more dangerous once the chemical ingredients are reacting together. Shutting down labs before the drugs are manufactured helps to prevent injuries to law enforcement and interrupts the flow of dangerous drugs to the street." (Assem. Com. on Pub. Safety, Rep. on Assem. Bill No. 2501 (1987–1988 Reg. Sess.) as amended Apr. 20, 1987, pp. 1–2; accord, Sen. Com. on Judiciary, Rep. on Assem. Bill No. 2501 (1987–1988 Reg. Sess.) as amended May 19, 1987, p. 3.) Discussion of the need for the bill focused exclusively on the need to shut down the operators of methamphetamine laboratories.

In 1995, the Legislature amended section 11383 to add subdivision (c)(2), covering possession of hydriodic acid or its precursors. (Stats. 1995, ch. 571, § 1, p. 4418.) The amendment was passed to close a loophole in section 11383 that had allowed illegal methamphetamine laboratory operators to purchase iodine and iodine crystals and manufacture hydriodic acid from them. (Assem. Com. on Pub. Safety, Rep. on Sen. Bill No. 419 (1995–1996 Reg. Sess.) as amended Mar. 28, 1995, pp. 2–3; *People v. McCall, supra,* 32 Cal.4th at pp. 190–191.) In contrast, hydriodic acid suppliers were understood as being regulated under section 11100, not section 11383. (Assem. Com. on

Pub. Safety, Rep. on Sen. Bill No. 419 (1995–1996 Reg. Sess.) as amended Mar. 28, 1995, p. 1.) Thus, section 11383 was understood as applying to those who were themselves operating methamphetamine laboratories and who intended to participate in manufacturing methamphetamine, not to the laboratories' suppliers.

The People argue that other similar statutes have been construed to criminalize possession with intent that someone else carry out a further prohibited act. For example, section 11351 criminalizes "possess[ion] for sale" of specified controlled substances. In *People v. Consuegra* (1994) 26 Cal.App.4th 1726, 1732, footnote 4 [32 Cal.Rptr.2d 288], and *People v. Parra, supra,* 70 Cal.App.4th at pages 226–227, the Courts of Appeal interpreted that language as extending to those who possess controlled substances with the intent that someone else sell them.

Here, the covered acts, statutory context, and grammar are quite different. *Parra* rested in part on the conclusion that there is "no meaningful distinction in culpability between the defendant who actually sells the controlled substance and the defendant who transports it with the specific intent that someone else will sell it, as they both share in the specific intent to sell." (*People v. Parra, supra,* 70 Cal.App.4th at p. 227; accord, *People v. Consuegra, supra,* 26 Cal.App.4th at p. 1732, fn. 4 ["We see no meaningful distinction in culpability between the individual who holds drugs to sell personally and the one who holds them for others to sell"].) The same cannot be said of the person who intends to sell precursor chemicals to a manufacturer and the person who intends to manufacture the final illegal substance. The statutory context discussed above reflects a legislative judgment that a person who intends to manufacture is more culpable than a person who sells the manufacturer the necessary chemicals; it follows that a person who intends to manufacture is also more culpable than a person who intends to sell, but has not yet sold, the necessary chemicals.[6] Finally, section 11351 criminalizes "possess[ion] for sale," not "possession with intent to sell." This passive construction, unlike the construction used in section 11383(c)(2), does not imply the possessor must also be the seller. Accordingly, *Parra* and *Consuegra,* which concerned possession for sale and not possession with intent to manufacture, are distinguishable.

■ Consequently, absent proof of intent to personally participate in manufacturing, Perez could not be convicted as a direct violator of section 11383(c)(2).

---

[6] Put another way, whether one transfers controlled substances to a seller or sells them, the vice is the same—that of distribution. In contrast, the supplier and the manufacturer are guilty of distinct vices—distribution and creation—that the legislative structure indicates should be treated differently.

The People argue that this interpretation of section 11383(c)(2), combined with a determination that aiding and abetting liability requires a predicate offense committed by a direct perpetrator, will hamper law enforcement efforts to shut down drug trafficking by constraining officers to wait until drugs have been delivered. Not so. A host of statutes criminalize involvement at various stages of the drug manufacturing process. (See *ante*, at pp. 1229–1230.) In addition, the law of attempt and conspiracy covers inchoate crimes and allows intervention before transfer, sale, or manufacturing has been completed.

In any event, if gaps do exist, the answer lies with the Legislature, not with the judicial distortion of either a centuries-old common law doctrine or the plain language of a statute aimed at methamphetamine laboratories. Logically, possession of methamphetamine precursors with intent to sell them to a methamphetamine manufacturer should be punishable under section 11378, but the evolution of methamphetamine manufacturing methods appears to have outpaced the statutory response. While the Legislature has amended sections 11100, 11104 and 11107.1 to regulate the sale of the methamphetamine precursors here at issue, it has not yet updated section 11378 or the section it cross-references, section 11055, subdivision (f), to regulate their possession for sale. If the Legislature wishes to amend these provisions to address this gap, it may do so.

### III. *Harmless Error Analysis*

Our interpretation of section 11383(c)(2) prevents us from concluding on the basis of that statute that the errors involving aiding and abetting law were harmless. We consider whether they were otherwise harmless in light of the evidence and remaining theories presented to the jury.

 As noted, the trial was infected by a pair of related errors. First, the trial court gave instructions on aiding and abetting when no proof of an essential element, an attempted or completed crime by a second party, had been introduced. Second, the trial court prevented defense counsel from arguing that this omission was fatal—that aiding and abetting in fact required proof of an independent crime— and overruled the defense's objection to prosecution argument that omitted this element. These are state law errors subject to analysis under *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. "Under *Watson*, reversal is required if it is reasonably probable the result would have been more favorable to the defendant had the error not occurred." (*People v. Guiton, supra,* 4 Cal.4th at p. 1130.)

■ The nature of this harmless error analysis depends on whether a jury has been presented with a legally invalid or a factually invalid theory. When one of the theories presented to a jury is legally inadequate, such as a theory which " 'fails to come within the statutory definition of the crime' " (*People v. Guiton, supra,* 4 Cal.4th at p. 1128, quoting *Griffin v. United States* (1991) 502 U.S. 46, 59 [116 L.Ed.2d 371, 112 S.Ct. 466]), the jury cannot reasonably be expected to divine its legal inadequacy. The jury may render a verdict on the basis of the legally invalid theory without realizing that, as a matter of law, its factual findings are insufficient to constitute the charged crime. In such circumstances, reversal generally is required unless "it is possible to determine from other portions of the verdict that the jury necessarily found the defendant guilty on a proper theory." (*Guiton,* at p. 1130.)

In contrast, when one of the theories presented to a jury is factually inadequate, such as a theory that, while legally correct, has no application to the facts of the case, we apply a different standard. (See *People v. Guiton, supra,* 4 Cal.4th at pp. 1129–1130.) In that instance, we must assess the entire record, "including the facts and the instructions, the arguments of counsel, any communications from the jury during deliberations, and the entire verdict." (*Id.* at p. 1130.) We will affirm "unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." (*Ibid.*)

The errors here may be characterized as involving the presentation of either a legally inadequate or a factually inadequate theory. We need not decide which characterization is correct because under either harmless error test, the error was prejudicial.

■ The prosecution argued to the jury a legally inadequate theory, the theory that possession of hydriodic acid precursors, plus the intent that someone else use them to manufacture methamphetamine, was criminal under either an aiding and abetting theory or as a direct violation of section 11383(c)(2). The trial court prevented defense counsel from pointing out the legal inadequacy of this theory. Nothing in the record establishes that the jury necessarily rejected this theory and instead convicted on the theory that Perez intended personally to manufacture methamphetamine. "[W]hen the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand." (*People v. Green* (1980) 27 Cal.3d 1, 69 [164 Cal.Rptr. 1, 609 P.2d 468].)

We reach the same result if we focus on the instructions and treat the error as a factual one. The jury was instructed with CALJIC No. 3.01, which correctly recited that an aiding and abetting conviction requires proof the defendant has "aid[ed], promote[d], encourage[d] or instigate[d] the commission of the crime." The giving of such a legally correct but inapposite instruction amounts to the presentation of a factually inadequate theory. (See *People v. Guiton, supra,* 4 Cal.4th at pp. 1129–1130.) Our review of the record affirmatively demonstrates a reasonable probability that the jury found defendant guilty solely on this unsupported theory.

If, in light of the trial court's rulings, we ignore the need to prove an independent crime, the evidence of aiding and abetting was stronger than that supporting any intent by Perez to personally manufacture methamphetamine. The sole evidence tying Perez to personal methamphetamine manufacturing was that he possessed iodine and red phosphorus, knew the chemicals he possessed could be combined to make methamphetamine, and had a pair of hydrogen-iodide-stained jeans. This same evidence equally supported the prosecution's aiding and abetting theory, but that theory was additionally supported by Perez's admissions to the police that he intended to sell the precursors to a third party and by the large amount of cash found in his possession. A jury might well doubt Perez's assertion that he intended to drive from Santa Ana to Pasadena for a $50 profit, but it would have to weigh any such doubt against the absence of evidence that Perez possessed any of the numerous remaining chemicals or instruments required to complete the manufacturing process (see *People v. Pierson, supra,* 86 Cal.App.4th at pp. 986–987), omissions that undermined the personal manufacturing theory but not the aiding and abetting theory.

Consistent with this state of the record, though the prosecution argued both theories during closing argument, it led with and spent more time arguing its aiding and abetting theory. Defense counsel likewise spent an extended period rebutting this theory, but again, the trial court's rulings precluded him from pointing out its fatal flaw.

The jury returned a general verdict, which offered no clue as to which theory it might have relied on in reaching a section 11383(c)(2) conviction. Given the evidence and argument, we are persuaded there is a reasonable probability the jury convicted Perez based solely on the unsupported aiding and abetting theory. Consequently, the errors in instructing on this theory and barring defense counsel from pointing out its flaws were prejudicial.

Disposition

For the foregoing reasons, we affirm the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., and Chin, J., concurred.

**BROWN, J., Concurring.**—I agree with parts I and II of the majority opinion, and part III to the extent it concludes that the jury was presented with a legally inadequate theory.

Here, as set forth in the majority opinion, the People proceeded on two theories regarding the charge of possessing hydriodic acid precursors with the intent to manufacture methamphetamine. (Health & Saf. Code, former § 11383, subd. (c)(2), Stats. 1995, ch. 571, § 1, p. 4418; maj. opn., *ante*, at p. 1224.) They argued defendant was "liable as a direct perpetrator because he possessed the precursors and personally intended to manufacture methamphetamine." (Maj. opn., *ante*, at p. 1224.) In the alternative, the People argued defendant was "liable as an aider and abettor because he possessed the precursors with the intent to sell them to another person to be used in manufacturing methamphetamine." (*Ibid.*) "During closing argument, the prosecution argued, over [defendant's] objection, that aiding and abetting liability required proof only that [defendant] possessed the hydriodic acid precursors with the knowledge that someone else would use them to manufacture methamphetamine. The trial court prevented defense counsel from arguing that liability for aiding and abetting required proof of a completed attempt or offense, and denied a proposed special instruction on this point, ruling that '[t]here's no need for a completed crime under the statute.' Instead, in accordance with the prosecution's theory of the case, the court gave CALJIC Nos. 3.00 and 3.01, standard instructions on aiding and abetting." (*Ibid.*) The jury convicted defendant, as relevant here, of violating Health and Safety Code former section 11383, subdivision (c)(2). (Maj. opn., *ante*, at p. 1224.)

In *Griffin v. United States* (1991) 502 U.S. 46 [116 L.Ed.2d 371, 112 S.Ct. 466], the high court "drew a distinction between a mistake about the law, which is subject to the rule generally requiring reversal, and a mistake concerning the weight or the factual import of the evidence, which does not require reversal when another valid basis for conviction exists." (*People v.*

*Guiton* (1993) 4 Cal.4th 1116, 1125 [17 Cal.Rptr.2d 365, 847 P.2d 45] (*Guiton*).) As the high court stated, "Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors *are* well equipped to analyze the evidence." (*Griffin*, at p. 59.) In *Guiton*, this court adopted the *Griffin* rule, which provides that "reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground," as state law for factually inadequate theories, and retained the rule of *People v. Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468], which generally requires reversal "absent a basis in the record to find that the verdict was actually based on a valid ground," for legally inadequate theories. (*Guiton*, at pp. 1125, 1128–1129.)

Here, the jury was permitted to find defendant guilty of a violation of Health and Safety Code former section 11383, subdivision (c)(2) on an aiding and abetting theory in the absence of any proof of the completed crime of either possession with the intent to manufacture methamphetamine or the actual manufacture of methamphetamine by a second party, and the "People eschewed any attempt theory." (Maj. opn., *ante*, at p. 1227.) The jury is ill-equipped to know that aiding and abetting liability cannot exist under these circumstances, and hence this theory was legally, not factually, inadequate.

While there may be some evidence of defendant's intent to personally manufacture methamphetamine, which was a proper legal and factual theory in this case, the presence of the legally inadequate theory means that "the *Green* rule requiring reversal applies, absent a basis in the record to find that the verdict was actually based on a valid ground." (*Guiton*, *supra*, 4 Cal.4th at p. 1129.) The majority properly concludes that there can be no direct violation of Health and Safety Code former section 11383, subdivision (c)(2) if one possesses hydriodic acid precursors with the intent someone else use them in manufacturing methamphetamine, and that the record does not demonstrate the jury actually relied on the theory defendant possessed the

precursors with the intent to personally manufacture methamphetamine. (Maj. opn., *ante*, at pp. 1227–1234.) Hence, the error is prejudicial under either the *Chapman* or *Watson* standard of review. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Moreno, J., concurred.