Filed 11/15/24  In re A.A. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.A., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>A.A.,<br><br>Defendant and Appellant. | F086952<br><br>(Super. Ct. No. JJD074980)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Tulare County.  Sylvia J. Hanna, Judge.

Arthur L. Bowie, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Jeff A. White, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Franson, Acting P. J., Meehan, J. and Snauffer, J.

Minor A.A. contends on appeal that the juvenile court's disposition order must be reversed because the court abused its discretion in concluding substantial evidence supported the court's findings that he conspired to commit robbery in counts 1 and 2 and aided and abetted robbery in counts 3 and 4. The People disagree. We affirm.

**PROCEDURAL SUMMARY**

On June 15, 2023, a juvenile wardship petition was filed, pursuant to Welfare & Institutions Code section 602, alleging minor committed two counts of conspiracy to commit robbery (Pen. Code, §§ 182, subd. (a)(1)/211;[1] counts 1 & 2); two counts of robbery (§ 211; counts 3 & 4); and assault on a peace officer (§ 245, subd. (c); count 5). As to counts 3 and 4 it was further alleged that a principal was armed with a firearm pursuant to section 12022, subdivision (a)(1). Minor denied the allegations.

On August 11, 2023, the juvenile court held a contested jurisdictional hearing. It found that counts 1 and 2 were true, but count 5 and the firearm enhancement allegation on counts 3 and 4 not true. The court reserved its ruling on the underlying offenses on counts 3 and 4.

On August 25, 2023, after further briefing by the parties, the juvenile court found counts 3 and 4 true.

On September 7, 2023, the juvenile court held a contested dispositional hearing. Following the hearing, minor was removed from the custody of his parents, placed on probation and committed to one year in the Tulare County midterm program.

On September 29, 2023, minor filed a timely notice of appeal.

**FACTUAL SUMMARY**

At approximately 2:20 a.m. on June 13, 2023, L.O. was working as a clerk at a truck stop. Three male subjects entered wearing masks, hoodies, and gloves. Two came into the store and approached L.O., while the third stood closer to the door. All three

---

[1] All statutory references are to the Penal Code unless otherwise noted.

2.

were armed with guns. L.O. triggered the silent alarm to notify the police. The subjects demanded money, and once L.O. gave them the cash drawers from the cash register till, they left. Approximately $900 was taken. The incident lasted approximately 30 seconds. Tulare County Sheriff's Deputy Salvador Becerra was dispatched in response to the truck stop's silent alarm.

Surveillance video footage from the truck stop's parking lot and inside the truck stop were entered into evidence. It showed three male subjects wearing all dark clothing exit a red car in the parking lot of the truck stop.[2] It then showed the arm and side profile of a fourth subject, wearing gray, sitting in the rear seat of the red car, reach out and pull the right passenger side door closed after the other three subjects exited the car. Moments later the left rear door of the car was also pulled closed from the inside. The subject, later identified as minor, who closed the car door remained in the back seat of the red car outside of the store.

The first subject that exited the car was wearing a black ski mask, black hoodie, black sweat pants, latex gloves, and holding a black revolver. The video from inside the truck stop showed him point the gun in the direction of the cash register in front of L.O. The video from inside the truck stop also showed the second subject, wearing a black ski mask, black hoodie, black sweat pants, and holding a silver revolver, also enter the store and point his revolver towards L.O. It then showed the third subject, wearing a black hoodie, long black cargo shorts, and a black ski mask run around the cash register and point a black handgun with a flashlight attachment at L.O.

The video footage then showed the three subjects who went into the truck stop to commit the robbery then return to the car approximately 30 seconds later and quickly get into the front passenger seat and right and left back passenger seats, while the

---

[2]     The car was identified as belonging to D.A. D.A. testified that on the morning of June 12, 2023, the car was stolen from her home.

3.

fifth subject, the driver, who had also remained in the car with minor during the robbery, started to drive the car away with them before they were finished shutting the car doors behind them.**3**

An hour later, at approximately 3:30 a.m., N.G. and C.B. were working inside a gas station convenience store. Surveillance video footage from the gas station, entered as evidence, showed a red car arrive. The video showed that, after three subjects exited the red car, one subject took a position at the front doors of the gas station convenience store while two other subjects went inside. The subject who was at the front doors was wearing black pants, a black hooded sweatshirt, black gloves, and holding a silver revolver. One subject who went inside was wearing a black ski mask, a black zip up sweater with a gray t-shirt underneath, black shorts, black shoes, and had a black and silver handgun. The third subject was wearing black pants, black Air Force 1 shoes, latex gloves and a black revolver.

N.G. testified that he saw the doors of the gas station "pop open" and heard yelling. He saw two male subjects inside the gas station. C.B. saw two subjects hopping over the counter and a third subject standing on the other side of the counter. They were wearing hooded masks. He ran down the hallway. When he eventually stopped and turned around, he saw "what was a young male—a masked male with a gun pointed in my face." The subject told C.B. to "move [his] a[**]," "Hurry the F up," and that C.B. was going to die if he did not open the safe. C.B. explained to the subject he did not have access to the safe, so the subject told him, " 'Then open the d[***] register.' " While the three subjects were inside the gas station, N.G. heard a car horn honk outside.

Around 3:30 a.m. on June 13, 2023, Visalia Police Officer Andrew Klorman got a "LoJack hit" alerting him to a stolen car in his area. The code from the LoJack report

---

**3**    During trial, the prosecution stated that there was a fifth subject, the driver but, "the driver was never located in this case."

was for a red car. Klorman and other officers located the red car in an apartment complex parking lot.

As Klorman tried to make contact with the car, it fled from the scene. It then collided with another officer's vehicle around the corner from the complex. In the police vehicle's dashcam video, entered into evidence, the subject sitting in the middle back seat of the red car is wearing a gray hoodie. After the collision, five occupants fled from the red car, running through the apartment complex and nearby areas.

After a chase on foot, four subjects were apprehended, including minor. Visalia Police Officer Marcus Henry ran after minor, telling him, " 'Stop. Police.' " Henry stated, "[A]t one point as [minor]'s coming in between a white truck and another vehicle, I see him reach into his pockets—and I was informed that the subjects were possibly armed with firearms, so I told the subject to stop reaching and get on the ground. Then he turned toward me in, like, a fast motion and ripped his hands out of his pocket, and I saw a large amount of cash come out of his hands and his sweater. [¶] … [¶] [A] couple hundred dollars ranging in 1s, 5s, 10s and 20s." Minor was wearing a gray sweater.

Two commercial cash drawers were found in the beds of two pickup trucks parked near where the red car had been parked in the apartment complex parking lot before it fled. Guns, masks, and other clothing items matching those the subjects were seen with at the robberies were found in nearby backyards.

Based on the surveillance video footage, police officers determined the four subjects who were apprehended, including minor, were involved in the robberies of the truck stop and the gas station. Minor was identified as the individual shown in the surveillance video in the back seat of the red car closing the car doors during the robbery of the truck stop.

5.

*Defense*

Minor stated during a police interview that at approximately 10:00 p.m. or 10:30 p.m., on the night the robberies occurred, he and his brother were picked up from a motel in Tulare and they attended a birthday party with five or six other people. Minor told police he did not know the names of the other subjects. He stated he and his brother attended a party until just after midnight and that he and the other subjects drove back to the apartment complex in the red car to "smoke weed and hang out," where they remained until contacted by the police. Minor stated that he and the other subjects had left the parking lot of the apartment complex in the red car after they "saw [police] officers walking … with flashlights, and he heard someone in the [red car] say the police were coming. So when they left the parking lot [in the red car], they ended up colliding with the [patrol] vehicle." He stated his brother had not been driving and said his brother " 'was a west side Tulare Norteno [gang member].' " Minor stated he "was trying to join the [same] gang."

## DISCUSSION

Minor contends the juvenile court abused its discretion when it found true counts 1 through 4 because there is insufficient evidence to support its findings that he (1) conspired to commit robberies in counts 1 and 2 and (2) aided and abetted the commission of the robberies in counts 3 and 4. The People disagree. We agree with the People.

### A.    *Background*

At the contested jurisdictional hearing, the prosecution argued that, while minor never got out of the red car at the truck stop and gas station, the evidence showing he shut the doors of the car when the other subjects went into the truck stop and gas station to commit the robberies showed minor participated in the robberies as a conspirator and aider and abettor. They further argued that he benefited from his participation in the robberies, "[a police officer] observed [minor] stick his hands into his sweatshirt, and

6.

when they tell him to bring his hands out, a large amount of cash flies out. That cash, your Honor, is connected to these robberies. A person who isn't associated with a robbery whatsoever wouldn't have taken that money. He wanted to benefit."

Defense counsel argued minor "didn't do anything that night, other than get out of a car that ran into an officer's car and started to run." Defense counsel denied it was a gang initiation and argued there was no overt act to prove minor was either a conspirator, or aider and abettor in the robberies.

The juvenile court found true counts 1 and 2, that minor had conspired to commit robbery (§§ 182, subd. (a)(1)/211). It stated,

> "[W]ith all the circumstantial evidence, the People have well proven that [minor] was part of the agreement to participate in that robbery for both [the truck stop] as well as the [gas station]. They exit the vehicle with hoods. They exit with guns. Someone who merely accompanies or associates with members of conspiracy but does not intend to commit a crime is not a member of the conspiracy is part of the jury instruction here. But I do truly believe that the conduct that [minor] had that night indicated that he did want to participate in that conduct and that he was well aware of what they were doing, was engaged in it, participated in it, had discussions of it, made preparation for it, and he wasn't just sitting there hanging out with his brother and then got caught up in it. It was fairly clear, circumstantially, that [minor] knew what was happening, and effectively, with the exception of walking in there himself with the firearm and taking the money—effectively participated in that conspiracy."

The juvenile court deferred its ruling on the robbery allegations in counts 3 and 4. When the parties reconvened on August 25, 2023, the court noted it had reviewed additional briefing and case law and was prepared to make a ruling on those counts. The court stated,

> "The evidence establishes in this case that the minor was not only present at the scene of the crime, was with the principals before the plan was put in operation, remained in their company during the first and second robbery in such a way to protect them during the taking and to facilitate an escape as a lookout, fled with them in the vehicle after the taking, and shared in the proceeds of the robbery. He remained in their

7.

presence after they reached a point of safety, and, finally, remained with them after the vehicle crashed and attempted to flee with the other principals.

"As the evidence shows, the minor ran from the vehicle when it ultimately crashed. He had a large portion of cash on his person. He remained in the backseat of the vehicle during both crimes as a lookout, and he was seen on video as shutting one of the car doors during the commission of one of the robberies so attention to the vehicle was not drawn during the commission of the offense. These are the reasonable inferences this Court has drawn. [¶] … [¶]

"Here there's no doubt that the direct perpetrators committed the crime of robbery with a firearm from two convenience stores in rapid success[ion], and that [minor] had knowledge of the unlawful intent. He was in a small car that was clearly stolen, considering the damage done to the steering column from the theft of the vehicle that was described by the individuals. He was in close proximity to three other people who wore black ski masks and black clothing to cover their faces. They were armed with loaded firearms and they robbed not only one, but two convenience stores in rapid succession. Again, the concern of this Court was the actus reus, the conduct of [minor] that would assist in the achievement of the crime as well as intent to do so. And that was the request for the briefing.

"Circumstantial evidence and reasonable inferences may be sufficient to establish a defendant's guilt as an aider and abettor of a robbery. The defendant's presence at the scene of the robbery, his association with the direct perpetrator before and after the robbery, and his flight from the scene are relevant for the fact finder's inquiry ….

"Mere presence of [minor] in the vehicle would not be enough. And that has been argued. The Court is well aware of that. While it remains wholly unknown to this Court what was actually said in the vehicle, who physically stole the vehicle, who acquired the firearms, and the circumstances that brought the three co[-]minors together, I don't need that. There's no direct testimony or evidence that was proffered regarding this. But what there is, is strong circumstantial evidence that the individuals, including [minor], who piled into that stolen vehicle, acted in concert. Each person was clothed, armed, and engaged in criminal activity. And it was clear that every member of the vehicle had a part to play. Whether it was for the intention to gain money or gang status, each person in the vehicle had a role to play and acted in concert to conspire and rob the two convenience stores.

8.

"After a time to reflect on the evidence, it's evident to this Court, through reasonable inference, that two people remained in the car. One was the get-away driver, and [minor], who was likely the lookout. The Court finds that the affirmative act of closing the door while the robbery at one of the convenience stores was done, was likely done so to conceal the car so no onlooker would have drawn their attention to the vehicle unnecessarily. This allowed the principal robbers inside the store to remain concealed from unwanted attention until the crime was complete. Additionally, and of greatest evidence, is that [minor] was paid. [Minor] was in possession of a large amount of cash, just as the others who physically went into the store to rob it. Like the principals, he got paid. It defies logic to this Court that [minor] would have gotten paid if he did absolutely nothing but sit in the car.

"This Court finds that he assisted in the robbery and got paid to do it, just as the principals did in the car as well. The Court finds that [minor] conspired with the others so the robberies yielded large amounts of cash in less than 30 seconds per hit. Based upon this evidence, the Court finds the two counts of conspiracy and the two counts of robbery as an aider and abettor in the petition true beyond a reasonable doubt."

**B.      Law**

When reviewing the sufficiency of evidence for a juvenile adjudication, we use the same standard of review that we would use in reviewing sufficiency of the evidence of a criminal trial. (*In re Roderick P.* (1972) 7 Cal.3d 801, 809.) In reviewing a challenge to the sufficiency of the evidence, the reviewing court must determine whether, " ' "*any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt*," ' " viewing " ' "the evidence in the light most favorable to the prosecution," ' " and examining the record "independently for ' "substantial evidence— that is, evidence which is reasonable, credible, and of solid value." ' " (*People v. Banks* (2015) 61 Cal.4th 788, 804.)

"Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence." (*In re Michael D.* (2002) 100 Cal.App.4th 115, 126.)

9.

"[W]hether the prosecutor relied upon direct or circumstantial evidence, if the trier of fact's determination is supported, reversal is not warranted, even where ' " 'the circumstances might also reasonably be reconciled with a contrary finding.' " ' " (*People v. Hill* (2024) 100 Cal.App.5th 1055, 1066.)

### C.     Analysis

Here, the juvenile court did not abuse its discretion when it found true counts 1 through 4 because substantial evidence on the record supports the court's findings that minor both conspired to commit the robberies (counts 1 & 2) and aided and abetted the commission of the robberies (counts 3 & 4).

### *Conspiracy to Commit Robbery (Counts 1 & 2)*

Minor first argues there is no substantial evidence on the record to support the juvenile court's finding that minor conspired to commit the robberies.

The crime of conspiracy is defined by statute as "two or more persons conspir[ing]" "[t]o commit any crime," together with proof of the commission of an overt act "by one or more of the parties to such [an] agreement" in furtherance of the crime. (§§ 182, subd. (a), 184.)  A conviction for conspiracy to commit a crime requires proof of:  (1) an agreement; (2) the specific intent to conspire; (3) the specific intent to commit the offense; and (4) an overt act towards achievement of that goal.  (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1128.)  These elements are sufficiently met by circumstantial evidence, particularly when those circumstances are the defendant's conduct carrying out the agreed-upon crime.  (*People v. Martin* (1983) 150 Cal.App.3d 148, 163; *People v. Bogan* (2007) 152 Cal.App.4th 1070, 1074.)

Proof of conspiracy does not require evidence of a formal agreement or even one expressed in words.  (*People v. Longines* (1995) 34 Cal.App.4th 621, 626; *People v. Jordan* (1937) 24 Cal.App.2d 39, 50.)  It may be inferred from coordinated group conduct.  (*People v. Lipinski* (1976) 65 Cal.App.3d 566, 575–576.)  A jury may find a conspiracy existed based on "the conduct, relationship, interests, and activities of the

alleged conspirators before and during the alleged conspiracy." (*People v. Cooks* (1983) 141 Cal.App.3d 224, 311.) "It is seldom possible for the prosecution to offer direct evidence of an agreement to commit a crime. The agreement to commit the crime is usually made in secrecy. The conspiracy must be inferred by the trier of fact from all the circumstances that are proven, and if the inference is a reasonable one it will not be disturbed on appeal." (*People v. Chavez* (1962) 208 Cal.App.2d 248, 253.)

Here, minor does not contest he was with the other subjects for the entirety of the evening that the robberies occurred, as he stated the other subjects, including his brother, picked him up in the red car, that the group then attended a party together, then went to the apartment complex together, where they fled from the police and were ultimately apprehended. Further, surveillance video from the truck stop robbery shows a subject in the back seat of the red car, identified as minor, when it was parked at the truck stop, pulling shut the right passenger and the left rear door from the inside after the other subjects got out to commit the robbery while he remained in the car. After the robbery of the truck stop was completed, surveillance video from the gas station showed the same red car arriving at the gas station. It next shows three subjects entering the gas station, again armed with firearms and wearing hoods and masks. While surveillance footage from the gas station does not show the inside of the car, N.G. testified he heard someone honk a car horn while three subjects were inside the gas station committing the robbery.

The evidence on the record further shows that after the robbery of the gas station, minor and the other subjects drove the red car to an apartment complex. There, register drawers from the gas station and truck stop tills were later found in the beds of two different pickup trucks parked in the apartment complex parking lot. The subjects, including minor, then fled as police arrived, hitting a patrol car, then running on foot. Minor was apprehended soon after, in possession of "[a] couple hundred dollars ranging in 1s, 5s, 10s, and 20s," which fell from his sweatshirt pocket.

11.

Based on the evidence on the record that minor was with the other subjects before the commission of the robberies, remained with them throughout both robberies, actively closed the car doors for the subjects when they exited the car to commit the truck stop robbery, and was in possession of approximately $200 in cash when he was apprehended after fleeing from the red car, the juvenile court's inference that minor "did want to participate in that conduct and … was well aware of what [the other subjects] were doing, was engaged in it, participated in it, had discussions of it, made preparation for it, and … wasn't just sitting there hanging out with his brother and then got caught up in it" was reasonable. The evidence on the record supports the court's inference that the subjects, including minor, specifically intended to make an agreement to commit the robberies prior to committing overt acts, including minor's acts of closing the car doors for the other subjects, his co-conspirators, during the robberies, to achieve the group's goal of robbing the truck stop and gas station.

Accordingly, the juvenile court did not abuse its discretion when it found true that minor committed conspiracy to commit the robberies of the truck stop and gas station in counts 1 and 2, as the findings were not outside the bounds of reason.

### Aiding and Abetting the Commission of Robbery (Counts 3 & 4)

Minor next argues there is no substantial evidence to support the juvenile court's finding that minor aided and abetted the commission of the robberies of the truck stop and gas station (counts 3 & 4).

Robbery is the taking of personal property in the possession of another from his person or immediate presence, against his will, accomplished by means of force or fear. (§ 211; *People v. Nguyen* (2000) 24 Cal.4th 756, 761.) An individual may be found liable for robbery either as a direct perpetrator or as an aider and abettor. (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.)

Liability for aiding and abetting requires "proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider

12.

and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez*, *supra*, 35 Cal.4th at p. 1225.)

The evidence discussed above is sufficient to show that the other three subjects in the group who were the direct perpetrators committed the robberies by entering the truck stop and gas station in hoods and masks with firearms and taking the register drawers filled with cash from the tills. The evidence also supports the juvenile court's reasonable inference that minor had direct knowledge of their unlawful intent beforehand and that he had an intent to assist them in achieving their unlawful end of taking money from the truck stop and gas station. The evidence also shows that minor committed overt acts to assist them by remaining in the car as a lookout at both robberies and closing the car doors at the truck stop when they exited it to commit that robbery, in addition to benefitting from the robberies, as he was in possession of approximately $200 in cash when he was apprehended.

Based on this evidence, the juvenile court's inference that minor committed the actus reus of closing the car doors at the truck stop "to conceal the car so no onlooker would have drawn their attention to the vehicle unnecessarily" was reasonable. Similarly, the court's inference, based on the evidence on the record, that, during the robbery of the gas station, when minor and the unidentified driver remained in the car and someone in it honked the horn, "[o]ne was the get-away driver, and [minor] … was likely the lookout" was reasonable.

Further, the juvenile court's inference that the approximately $200 cash that minor was in possession of when he was apprehended shortly after the robberies was payment for participating in the robberies was reasonable, as he stated he was with the other subjects the entire evening they committed the robberies, and as the court stated, "[i]t

13.

defies logic … that [minor] would have gotten paid if he did absolutely nothing but sit in the car."

Accordingly, the juvenile court did not abuse its discretion when it found true counts 3 and 4 that minor aided and abetted the commission of the robberies, as it was not outside the bounds of reason.

## **DISPOSITION**

The disposition order is affirmed.

14.