Filed 6/27/13  P. v. Fonseca CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B233619 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA086437) |
| v. | |
| GERARDO FONSECA et al., | |
| Defendants and Appellants. | |

APPEAL from judgments and orders of the Superior Court of Los Angeles County.  Robert M. Martinez, Judge.  Reversed in part and affirmed in part as to Fonseca.  Affirmed as to Anda.

Leslie Conrad, under appointment by the Court of Appeal, for Defendant and Appellant Gerardo Fonseca.

Kim Malcheski, under appointment by the Court of Appeal, for Defendant and Appellant Juan Anda.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey and Taylor Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Juan Anda, Gerardo Fonseca, and Melissa Goree were each charged with the first degree murders of Jason Guijarro and Isaac Parra, the attempted murders of Daniel Carrasco and Clarisse Garcia, and conspiracy to commit murder.  Fonseca was also charged with making criminal threats against Carrasco.  Fonseca and Anda were convicted on the murder and conspiracy charges, and the court denied their motions for a new trial.  Fonseca was acquitted on the charge of making criminal threats.  Goree was acquitted on all charges.

After reviewing the briefs and the record, we requested supplemental briefing on an issue of instructional error relating to both defendants and on the sufficiency of the evidence against Fonseca on all charges.  We conclude that the court did commit instructional error, which was prejudicial as to Fonseca on the murder charges but harmless as to Anda.  We also conclude that the evidence against Fonseca was sufficient to sustain the convictions.  We accordingly affirm as to Anda but reverse in part and affirm in part as to Fonseca.

**FACTS AND PROCEEDINGS BELOW**

### A.  The Love Quadrangle

Daniel Carrasco was defendant Goree's boyfriend until she started dating defendant Fonseca and Carrasco started dating Clarisse Garcia.  Carrasco testified that although he was dating Garcia, he and Goree were "try[ing] to get back together."  Carrasco, Garcia, and Goree lived in the same apartment building.

Carrasco (Goree's old boyfriend) and Fonseca (Goree's new boyfriend) did not get along.  Three days before the shooting Carrasco challenged Fonseca to a fight.  Fonseca did not accept Carrasco's challenge, but he did make a series of threatening telephone calls to Carrasco.  In one of those calls on the day of the shooting, Fonseca told Carrasco to leave Goree alone or "'I'm going to put you in the grave.'"  He also told Carrasco he would do the same thing to Carrasco's mother.  Carrasco testified that Fonseca's threat made him "a little scared," because he believed Fonseca was capable of carrying out that threat.

2

In the afternoon on the day of the shooting, Fonseca got into an argument with Carrasco's friend Guijarro on the sidewalk in front of Goree's apartment building. Guijarro accused Fonseca of harassing Carrasco. Guijarro made a cell phone call to Corey Gardner, who also lived in the building, and asked Gardner to come to where he and Fonseca were arguing. Gardner came and briefly joined in the argument. He testified that the argument broke up shortly after he arrived, and Goree and Fonseca drove off in Goree's Honda. Gardner denied bringing a gun with him to the altercation, denied that Guijarro had a gun, and denied that anyone pointed a gun at anyone. A West Covina police officer witnessed the argument from across the street. He saw Guijarro, Gardner, and Fonseca arguing and making hand gestures but did not see any weapons.

When Fonseca and Goree left Goree's apartment building, they drove to the home of Fonseca's cousin, defendant Anda. In a statement to the police read to the jury Anda said that Fonseca told him Guijarro and Gardner "pulled a gun out on his head, and they told him to get the fuck outa here, or else they were gonna kill him." Fonseca wanted Anda to lend him his gun or go with him to fight Guijarro and Gardner. Anda refused to do either. "I told him, 'Are you stupid?' They got a gun, and you got a baby in the fucking car, and you want to go get in a fistfight? I been shot, fool. I ain't going out there."[1] Anda told Fonseca to go home.

Garcia testified that on the same evening Goree telephoned Carrasco while he was with Garcia. Garcia got on the line and told Goree to stop calling Carrasco. Goree told Garcia, "I'm going to go beat your ass." Garcia responded, "Fine. Come beat my ass." To which Goree countered, "You're dead." Goree called Garcia a "bitch" and repeated "you're dead" several times. Just before the call ended, Garcia heard Goree say, "Huero, let's go" or "Come on, Huero." The parties stipulated that Anda was known as "Johnny Huero."

---

[1]     The baby was apparently Goree's two-year-old nephew.

After the call ended, Garcia and Carrasco joined Guijarro and Isaac Parra in Guijarro's van to smoke pot. The van was parked in front of the apartment building where Carrasco, Garcia, and Goree lived. Guijarro sat in the driver's seat; Parra sat in the passenger seat next to him; Carrasco and Garcia sat in the back seats. They had been sitting in the van for 10 or 15 minutes when Fonseca drove by in Goree's Honda. Goree was in the front passenger seat, and her two-year-old nephew was in the back seat. (The identification of the child as her two-year-old nephew comes from Goree's police interview, which was attached to a post-trial motion but was not presented at trial; Anda referred in his police interview to a "baby" in the back seat of the car.)

## B. The Chase

There is a conflict in the testimony as to what happened next.

Carrasco testified that when he saw Fonseca and Goree coming down the street in Goree's Honda he told Guijarro to drive away because he thought "something was going to happen." Fonseca and Goree followed them. Garcia, however, testified that when the Honda came down the street where the van was parked, Guijarro started the van and began following the Honda. After a short time, Guijarro pulled up next to the Honda and started shouting and cursing at Fonseca and Goree. Fonseca and Goree yelled and cursed back. According to Garcia, "That's when the chase started. . . . [The Honda] took off and then [the van] took off right after them." The brakes on Guijarro's van started to smoke, and he pulled into a gas station. The Honda stopped briefly in the left lane by the gas station, waiting to make a left turn. Some of the van's occupants got out and screamed at Goree and Fonseca in the Honda. Neither Fonseca nor Goree responded, but Fonseca may have gestured at them. (When asked at trial to demonstrate the gesture Fonseca made, Carrasco raised his right arm above his head and waved his hand to the left, toward his head. But Carrasco also testified that Fonseca made the gesture with his left hand, outside the window of the Honda. It is consequently unclear what gesture, if any, Fonseca made.) The Honda drove away, and the van followed.

A surveillance video played for the jury shows what appears to be the Honda driving on Merced Avenue trailed by the van, with a third vehicle on the van's right. The vehicles go out of view after passing some bushes, a wall, and an apartment building; Leland Avenue, the dead-end street on which Anda lived, is on the far side of the apartment building, also out of view. The Honda apparently turned right onto Leland, followed by the van. (Both Garcia and Carrasco testified, however, that the van somehow got ahead of the Honda and turned onto Leland *before* the Honda, which followed the van onto Leland, passed it, made a u-turn, and then cut off the van, with both vehicles' headlights facing each other.) The video shows that, assuming the van turned right onto Leland, it did so from the left lane on Merced, apparently cutting off the third vehicle (not the Honda) in the process.

In his statement to the police Anda said that shortly before the shooting Fonseca called him and declared: "Primo, they're chasing me. They're chasing me. I don't know how many guys there are. . . . I'm driving. I'm driving." Anda gave the police two different versions of his response to Fonseca. In the first version he told Fonseca: "Well, drive into my driveway." In the second version he told Fonseca "go [to] grandma's," and Fonseca responded "I'm—we're right here by your house." Anda replied, "Fuck, man, why you gotta come to my house for? . . . Why you gotta come to me?" Anda also stated that he feared for the safety of the baby in the back seat of the Honda.

Officer Nicholas Franco of the West Covina Police Department testified that he received a call about a shooting on Leland Avenue at approximately 10:20 p.m. on March 31. The prosecution introduced telephone records showing calls from Goree's cell phone to Anda's phone that evening at 9:55, 10:06, 10:15, and 10:19, and from Anda's phone to Goree's cell phone at 10:18. Each call lasted a minute or less. The phone company's representative testified that the records only show that a call was placed from the customer's phone to another phone. The records do not show whether the call was answered or unanswered or went to voicemail.

5

## C.    The Murders

In questioning by the police, Anda stated that after receiving the telephone call from Fonseca he went outside his apartment building and saw Fonseca in the Honda on Merced Avenue being chased by a van and a black car. As he drew near the corner of Leland and Merced, he could tell that the people in the black car saw him, so he turned around and started running back down Leland, fearing that the men in the black car were going to shoot him. The black car did not turn down Leland but stayed on Merced. The van turned onto Leland and stopped. (Though it is not entirely clear, Anda's statement appears to echo Garcia's and Carrasco's testimony that the van turned onto Leland before the Honda.) As Anda approached the van, someone jumped out. Anda thought the person who jumped out and the people in the van were going to shoot him, so he fired two shots in the air and told the people in the van to put their hands up.

Stephanie Del Brias testified that on the night of the shooting she was on the sidewalk outside her apartment building on Leland Avenue picking up cigarette butts. A man walked down a pathway from one of the apartment entrances and stood near her for a few seconds. The man was wearing sweatpants and a sweatshirt with a hood that hid his face. Three to five seconds later, the man started running up Leland toward Merced. Del Brias saw a white van turn onto Leland and stop in the middle of the street. The man in the sweat clothes started shooting at the van. When the shooting started, Del Brias noticed for the first time that a Honda in front of the van prevented it from moving forward. The man stopped shooting and ran toward the freeway. After the shooting stopped, Del Brias saw the Honda make a U-turn on Leland. A man got out of the Honda, approached the van, and then ran back to the Honda and quickly drove away.

Guadalupe Mendoza, who also lived on Leland, testified that she heard gunshots and looked through the sliding glass door on her patio. She saw a van and someone shooting at the van. The first time she saw the Honda the shooter was already shooting at the van. The Honda came down Leland, made a U-turn at the end of the street and went

6

back out toward Merced. As the Honda sped down Leland, someone in the Honda yelled at the van.

Guijarro died from two gunshot wounds to the head. Parra died from three gunshot wounds to the back. The police found no guns in the van.

Fonseca made three telephone calls from jail. In the portions of the calls played to the jury, Fonseca stated that he was concerned that Goree was going to "break" on him. He told his sister that "if she breaks I'm through" and told his mother to encourage Goree to "be strong" and not to "break" or "say[] anything."

In a recorded jail conversation between Anda and Fonseca, Anda mentioned that the police had a witness named Juan who saw Anda running after the shooting. Fonseca replied: "It's too bad we can't contact that mother fucker[.] . . . Someone needs to get at him."

### D. The Defense Case

None of the defendants testified or presented substantive evidence in their defense. Goree and Anda presented character witnesses.

In his closing argument Anda maintained that he shot into the van in self-defense and in defense of his cousin Fonseca, the child in the car, and Fonseca's girlfriend, Goree. Fonseca maintained that he and Goree were the hunted, not the hunters, and had nothing to do with the deaths of Guijarro and Parra.

### E. The Verdicts and Sentences

The jury found defendants Anda and Fonseca guilty of the first degree murders of Guijarro and Parra and guilty of conspiracy to commit murder. Multiple murder special circumstance allegations and various gun use allegations were found true as to both defendants. The jury found Anda and Fonseca not guilty of the attempted murders of Carrasco and Garcia and of making criminal threats. Goree was found not guilty of all charges.

The court sentenced Anda to two consecutive terms of life without the possibility of parole on the murder convictions plus two consecutive terms of 25 years to life on the

7

personal gun use allegations under Penal Code section 12022.53, subdivision (d). The court imposed and stayed a term of 25 years to life on the conspiracy conviction and struck the remaining firearm use allegations.

The court sentenced Fonseca to two consecutive terms of life without the possibility of parole on the murder convictions plus two consecutive terms of one year on the principal armed gun use allegations under Penal Code section 12022, subdivision (a)(1). The court imposed and stayed a term of 25 years to life on the conspiracy conviction.

### F.      The Motion For A New Trial

After the jury acquitted Goree of all charges against her, Anda and Fonseca moved for a new trial on the ground of new evidence. They argued that in a new trial Goree could provide exculpatory evidence that could not have been compelled so long as she remained a defendant. They submitted Goree's statement to the police as an offer of proof in support of their motion. They did not submit a declaration from Goree.

In her statement to the police, Goree said that on the evening of the shooting Garcia called her and told her to stop "the drama" with Carrasco. Garcia and Goree called each other "bitch" and traded other insults. Garcia told Goree that the next time she saw her, "I'll kick your ass." After Garcia's call, Goree and Fonseca drove to the apartment building where Goree, Carrasco, and Garcia lived. Goree did not see Garcia, and she and Fonseca kept driving. That was when the van started following them.

Goree confirmed that it was her Honda shown in a 7-11 Store surveillance video, speeding from the area of Baldwin Park High School, running a red light and being chased by the van. The van's headlights were flashing on and off as it followed the Honda.

The investigating officer asked Goree whether Fonseca called anyone while they were being chased by the van. Goree answered that Fonseca made one call in which "he actually, like, talked." She heard Fonseca tell the person on the other end, "I'm in

8

trouble. This car's following me," and then, "All right." Fonseca told her that the person he spoke to "told him to just go home."

Goree told the police that when she and Fonseca turned onto Leland Avenue, the van followed them. They stopped, and the van stopped behind them. The doors of the van opened, and she heard gunshots. At first she thought the people in the van were shooting at her and Fonseca. Later she saw the person who was shooting at the van, but she did not know who it was. The shooter told her and Fonseca to "get the fuck out of here," and they did.

After reading Goree's statement, the court ruled that assuming Goree's testimony qualified as newly discovered evidence, it was "redundant and cumulative" and a "rehash of what was actually presented to this jury."

## DISCUSSION

### I. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING THE MOTION FOR A NEW TRIAL

Fonseca and Anda argue that the trial court abused its discretion by denying their motion for a new trial based on newly discovered evidence, namely, Goree's interview with the police. We disagree.

"In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: "'1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits.'" [Citations.]" (*People v. Delgado* (1993) 5 Cal.4th 312, 328 (*Delgado*).) """The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.""" (*Ibid.*)

9

Our analysis of appellants' challenge to the denial of their new trial motion necessarily begins with identification of the newly discovered evidence on which the motion is based. The only evidence attached to the motion was the transcript of Goree's police interview. Anda and Fonseca do not contend, however, that they did not have that transcript before trial, and they thus do not argue that the transcript itself is newly discovered. Rather, they claim that (1) they could not have compelled Goree to testify at trial because she could have invoked her Fifth Amendment rights, (2) now that she has been acquitted, they could compel her to testify at a new trial, and (3) if called to testify at a new trial, she would provide exculpatory testimony in line with her statements to the police. Consequently, the newly discovered evidence on which the motion is based is the as-yet unheard testimony that Goree would give at a future retrial.

In order to prevail on a new trial motion based on newly discovered evidence, the defendant must show that the evidence would render a different result probable upon retrial, and the defendant must make that showing with the best evidence of which the case admits. (*Delgado*, *supra*, 5 Cal.4th at p. 328.) On the basis of those two factors, we conclude that the trial court did not abuse its discretion by denying the motion. The best evidence of how Goree would testify upon retrial would be a declaration from Goree, presenting her version of the facts and stating under penalty of perjury that she would so testify if called as a witness at a retrial. The record before us contains no evidence that Goree's future testimony would match the statements in her police interview. Witnesses do not always say the same things in court that they said to the police. The trial testimony of Garcia and Carrasco, for example, was admittedly inconsistent with information they had given to the police at various times. Moreover, because we do not really know what Goree's testimony upon retrial would be (because we have no declaration stating that she would testify consistently with her police interview if called as a witness at retrial), we cannot conclude that such testimony would render a different result probable. Without better evidence of the content of Goree's future testimony, the trial court could not determine how that testimony might affect the

10

outcome of a new trial, and neither can we. Accordingly, we must conclude that Anda and Fonseca have failed to show that the trial court abused its discretion by denying their motion.[2]

## II. THE TRIAL COURT COMMITTED INSTRUCTIONAL ERROR THAT WAS PREJUDICIAL AS TO FONSECA'S MURDER CONVICTIONS BUT HARMLESS AS TO ANDA

After reviewing the briefs and the record, we requested supplemental briefing on the following issues: (1) As to both Anda and Fonseca, whether the trial court committed prejudicial error in its instructions concerning liability for crimes committed by co-conspirators, and (2) as to Fonseca, whether the record contains substantial evidence to support his convictions for murder and conspiracy to commit murder. We now conclude that the jury instruction at issue was erroneous, but the error was prejudicial only as to Fonseca.[3]

The trial court used CALCRIM No. 417 to instruct the jury on liability for crimes committed by co-conspirators, stating in relevant part: "To prove that the defendant is guilty of the crimes charged in Counts 1 and 2 [i.e., the murder counts], the People must prove that: [¶] 1. The defendant conspired to commit one of the following crimes: attempted murder as charged in Count[s] 3 and 4; [¶] 2. A member of the conspiracy committed murder as charged in 1 and/or 2 to further the conspiracy; [¶] AND [¶] 3. The murder charged in Count 1 and/or 2 was a natural and probable consequence[] of the

---

[2]      Because it may be of significance in postconviction proceedings (if any), we wish to make clear that we do *not* determine that if Goree's future testimony were to match her police interview, then it would not make a different result probable. We do not reach that issue at all. Rather, we determine that because the only evidence Anda and Fonseca presented concerning the content of Goree's future testimony was the transcript of her police interview, and because the police interview is relatively weak evidence of what Goree would say if called as a witness at retrial, Anda and Fonseca have failed to show that the trial court abused its discretion by denying their motion.

[3]      Fonseca did not object to the instruction at trial, but he still can challenge the instruction on appeal because the error affected his substantial rights. (Penal Code, § 1259.) Respondent does not argue to the contrary.

11

common plan or design of the crime that the defendant conspired to commit." Thus, the court instructed the jury that it could find Anda and Fonseca guilty on the murder counts if the jury determined that Anda and Fonseca conspired to attempt to murder Garcia and Carrasco and a member of the conspiracy murdered Guijarro and Parra as a natural and probable consequence of that conspiracy.

The instruction was erroneous because, as a matter of law, there is no such crime as conspiracy to commit attempted murder. (*People v. Iniguez* (2002) 96 Cal.App.4th 75, 77.) Respondent does not argue that the instruction was not erroneous.

"'[W]hen the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand.'" (*People v. Perez* (2005) 35 Cal.4th 1219, 1233, quoting *People v. Green* (1980) 27 Cal.3d 1, 69.) The prosecution presented its case against Fonseca on the murder counts on two theories: conspiracy and aiding and abetting. We cannot determine on which theory his guilty verdicts rested, so we must reverse his murder convictions. We can, however, determine that the jury found that Anda personally committed the murders, so the instructional error was harmless as to him.

As to Fonseca, respondent argues that because the remaining instructions, the information, the verdict forms, and the prosecution's closing argument referred to conspiracy to commit murder rather than conspiracy to commit attempted murder, we should conclude that the error was harmless beyond a reasonable doubt. We disagree. Although the remaining instructions, the information, the verdict forms, and the prosecution's closing argument did refer to conspiracy to commit murder rather than conspiracy to commit attempted murder, the fact remains that the instructions allowed the jury to convict Fonseca of murder on a legally invalid theory. Under binding Supreme Court precedent, that error requires reversal unless we can determine that the jury did not rely on the invalid theory. (*People v. Perez*, *supra*, 35 Cal.4th at p. 1233.) The references, in the instructions and elsewhere, to other theories do not allow us to

12

make that determination. Rather, they still leave open the possibility that the jury relied upon the legally invalid theory on which it was instructed.

Respondent further argues that we can determine the theory on which the jury relied, because the jury acquitted both Anda and Fonseca of the attempted murders of Garcia and Carrasco. According to respondent, "if the jury found that appellants did not attempt to murder Garcia and Carrasco, then the jury *necessarily* found that appellants did not *conspire* to commit attempted murder," and any argument to the contrary "simply defies logic and reason." Again, we disagree. Although the jury found that Anda and Fonseca did not in fact attempt to murder Garcia and Carrasco, the jury (not knowing that it had been instructed on a legally invalid theory) could have consistently found that Anda and Fonseca conspired to attempt to murder Garcia and Carrasco—that is, the jury could have found that defendants conspired to attempt those murders but did not end up attempting those murders. Indeed, it is easy to imagine how the jury could have reached that result on the record in this case. A reasonable inference from the evidence was that the shooter approached the passenger door of the van and fired into the front seats, killing Guijarro and Parra, but that no shots were fired into the rear seats, where Garcia and Carrasco were located. On that basis, the jury could have reasonably determined that the shooter did not commit a direct but ineffectual act toward killing Garcia and Carrasco, so the shooter did not commit the attempted murders that he had conspired to commit.

For all of the foregoing reasons, we conclude that the instructional error was prejudicial as to Fonseca, so his murder convictions must be reversed and his sentences on those convictions vacated.[4]

---

[4] Fonseca also argues that the sentences on his murder convictions were erroneous. Our reversal of his murder convictions renders the argument moot, so we do not address it.

Fonseca further argues that the sentencing minute order and the abstract of judgment do not match the judgment (i.e., the trial court's oral imposition of sentence), because the minute order and abstract impose but stay a $200 parole revocation restitution fine, but the judgment does not impose such a fine at all. Fonseca argues that the discrepancy is a clerical error, that the fine is improper because he was sentenced to

As to Anda, however, we can determine that the jury relied on a valid theory. The jury found true the personal use of a firearm allegation as to Anda, so it must have determined that he was the shooter (and, in his police interview, he admitted being the shooter). The jury also convicted Anda (and Fonseca) of the murders of Guijarro and Parra, so it determined that the killings were murders rather than some other form of homicide. Accordingly, the jury must have found that Anda himself murdered Guijarro and Parra, so those convictions were not based on the conspiracy instruction. The erroneous conspiracy instruction was therefore harmless as to Anda.

## III. THE RECORD CONTAINS SUBSTANTIAL EVIDENCE TO SUPPORT FONSECA'S CONVICTIONS

In response to our request for supplemental briefing, Fonseca argues that the evidence is insufficient to support his convictions.[5] Although we believe it is a close case, we conclude that the record contains sufficient evidence to sustain the convictions.

"The standard of review [for challenges to the sufficiency of the evidence] is well settled: On appeal, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence

---

life without parole, and that the minute order and abstract should be corrected to match the judgment. Respondent argues that the fine was proper, so the judgment should be corrected to match the minute order and abstract. Respondent is correct that a parole revocation restitution fine should have been imposed but stayed, notwithstanding the sentences of life without the possibility of parole. (See *People v. Brasure* (2008) 42 Cal.4th 1037, 1075.) Because we reverse Fonseca's murder convictions and vacate his sentences on those convictions, however, we do not know what the ultimate outcome on those counts will be—we do not know whether they will be retried and, if so, whether he will be convicted and what sentences will be imposed. When those issues are resolved on remand, the trial court shall include any mandatory fines in the new judgment, minute order, and abstract of judgment.

[5]    Although we reverse Fonseca's murder convictions on the basis of instructional error, the substantial evidence argument is not moot as to those convictions, because the murder charges cannot be retried if they were not supported by substantial evidence at the first trial. We therefore must address the substantial evidence issue as to all of Fonseca's convictions.

14

that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] "'[I]f the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.'" [Citation.] 'The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.'" [Citation.]" (*People v. Snow* (2003) 30 Cal.4th 43, 66.)

Anda knew about the conflict among Fonseca, Goree, Carrasco, and Garcia. On the day of the murders, Fonseca threatened to put Carrasco in his grave and also had a heated encounter with Carrasco's friends Guijarro and Gardner. Anda stated in his police interview that Fonseca told him about the encounter and asked Anda to come with him to "fuck these guys up." Anda also admitted in his police interview that Fonseca called and spoke to him during the car chase when Fonseca was near Anda's home. The cell phone records confirm that calls were placed that night from Goree's cell phone to Anda at 9:55, 10:06, 10:15, and 10:19, and that Anda called Goree's cell phone at 10:18. The murders took place at approximately 10:20 p.m., when Fonseca led the van onto Leland where Anda was waiting, armed with a handgun. Anda fired multiple rounds into the van, killing Guijarro and Parra.

Although other reasonable inferences are possible, the jury could have reasonably inferred from this circumstantial evidence that Anda and Fonseca conspired to kill Carrasco and Garcia by leading them into an ambush on Leland. And the jury also could have reasonably inferred that the killings of Guijarro and Parra were natural and probable consequences of that conspiracy, or that Fonseca had aided and abetted the murders by luring the victims into the trap. We accordingly reject Fonseca's challenge to the sufficiency of the evidence to support his convictions.

15

## DISPOSITION

As to defendant Gerardo Fonseca, the murder convictions are reversed and the sentences on those convictions are vacated, but the conspiracy conviction and the sentence on that conviction are affirmed. As to defendant Juan Anda, the judgment is affirmed.

NOT TO BE PUBLISHED.


ROTHSCHILD, J.

We concur:


MALLANO, P. J.


JOHNSON, J.

16