Filed 11/21/23  P. v. Wilkins CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VIRGIL JEROD WILKINS,<br><br>    Defendant and Appellant. | D080898<br><br><br>(Super. Ct. No. FVI800686) |

APPEAL from an order of the Superior Court of San Bernardino, J. David Mazurek, Judge.  Affirmed.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, James M. Toohey, and Elizabeth M. Renner, Deputy Attorneys General for Plaintiff and Respondent.

# I

# INTRODUCTION

Virgil Jerod Wilkins appeals an order denying a petition to vacate his conviction for the first degree murder of Alberto Cervantes pursuant to Penal Code section 1172.6.[1]  He argues substantial evidence does not support the trial court's finding that he is guilty of Cervantes's murder under a currently valid theory of murder liability.  We affirm.

# II

# BACKGROUND

A. *Factual Background*

Wilkins and codefendant Harold Wesley Meeks were charged with one count of first degree murder for the unlawful killing of Alberto Cervantes (§ 187, subd. (a)) and one count of arson (§ 451, subd. (d)).  The defendants were tried jointly before separately empaneled juries.

1. *Prosecution Case*

a) *The Discovery of Cervantes's Body*

On March 8, 2007, shortly before 9:00 p.m., San Bernardino County firefighters responded to a report of a vehicle fire.  When they arrived on the scene, they found a small pickup truck parked in a drainage culvert and engulfed in flames.  The firefighters extinguished the fire and discovered the burned body of Cervantes, the truck's owner, lying in the truck bed.  There was a laceration on Cervantes's head that occurred prior to his death.

---

[1]    At the time Wilkins filed his petition for resentencing, former Penal Code section 1170.95 codified the procedures governing such petitions. Assembly Bill No. 200 (2021–2022 Reg. Sess.) renumbered former Penal Code section 1170.95 as Penal Code section 1172.6.  (Stats. 2022, ch. 58, § 10.)  For purposes of this opinion, we will refer to this statute as Penal Code section 1172.6.  Further undesignated statutory references are to the Penal Code.

2

Law enforcement did not find evidence of a struggle in the area around the pickup truck. They determined someone killed Cervantes elsewhere and transported his body to the location where the firefighters found it. They also concluded the fire was the result of arson and Cervantes died of blunt force trauma to the head.

b) *I.C. (Cervantes's Ex-Wife)*

About six months before Cervantes was killed, he and I.C.—his wife of 14 years—divorced. During the marriage, the couple bought two homes and four vehicles. Under the couple's divorce settlement agreement, Cervantes and I.C. each received one home and two vehicles.

Cervantes worked in the construction industry and I.C. worked at a warehouse grocery store with both of the defendants. I.C. testified she did not know Wilkins well, but she was "good friends" with Meeks. She denied having a romantic relationship with Meeks; however, their coworkers suspected otherwise. So did Meeks's ex-girlfriend, who testified I.C. and Meeks were romantically involved. She testified I.C. and Meeks were always together at work, they frequently called each other outside of work hours, I.C. avoided her when she visited the store, and she once saw Meeks's car parked at I.C.'s home. I.C. also babysat Meeks's daughter and once bought him a $6,000 motorcycle.

I.C. testified that she received a suspicious call on her cell phone from an unknown female caller in the early morning hours of March 10, 2007—two days after Cervantes's body was discovered. The caller said there was something in her mailbox. I.C. checked her mailbox a few hours later and found a white padded envelope inside it. She called a detective about the envelope and he told her to put it somewhere safe until he arrived.

According to I.C., Meeks stopped by her home before the detective arrived. She said Meeks put on gloves, shook the envelope, and placed it inside her home, but left before the detective arrived. I.C. did not tell the detective or anyone else about Meeks's alleged presence at her home until the week of her testimony. After the detective arrived at I.C.'s home, he opened the envelope. It contained Cervantes's keys, his credit cards, a portion of his wallet, family photographs, and a typewritten letter with a signature that was purportedly written by Cervantes. The letter stated Cervantes was involved with the wrong people, he had to flee for his safety, and he was giving all of his property to I.C. and the couple's children.

c) *Meeks*

A few weeks before Cervantes's killing, Meeks called a coworker from Wilkins's residence. Meeks asked the coworker whether he knew what kind of acid could be used to burn or melt human flesh and whether their employer carried anything that could be used for that purpose. The coworker identified a product from the store that might suit Meeks's needs. The next night, at work, the coworker showed the product to Meeks and Meeks said, "Never mind. I already figured it out." Meeks stated that he planned to put the acid or product "in a bottle or something and throw it at some random guy."

d) *M.K. (Wilkins's Roommate)*

M.K. was Wilkins's friend and roommate at the time of Cervantes's killing. M.K. was acquainted with Meeks by virtue of his relationship with Wilkins. M.K. testified to the following events from the night of the killing.

At 6:28 p.m., M.K. received a call from Wilkins while M.K. was at work. Wilkins asked M.K. what he was doing and M.K. said he was at work. Twenty minutes later, Meeks called M.K. Meeks asked M.K. when he would be coming home and M.K. said he did not know. Meeks told M.K. to take his

4

time because someone was coming to the house to talk with Wilkins about doing his taxes.  M.K. agreed to take his time and did some chores and socialized with a friend for about an hour and a half before heading home.

At 8:00 or 8:15 p.m., M.K. and a friend drove to M.K. and Wilkins's residence in separate vehicles.  When they arrived, M.K. tried to open his garage door, but it would not open.  M.K. and his friend entered the home through the front door and M.K. went into the garage to see why the garage door would not open, but upon entering it he saw a pool of blood on the floor.  Items from the garage refrigerator and shelves were strewn across the floor as well.  Neither Wilkins nor Meeks was present.

Soon after, Wilkins and Meeks entered the residence through the front door.  M.K. asked them what happened to the garage and Meeks said he got into a fight with some "Mexican guys" who harassed him and followed him back home.  Meeks told M.K. he did not need to worry about retaliation from the "Mexican guys" because "it was over" and "they wouldn't come back."

Meeks asked M.K.'s friend for a "ride around the corner" and the friend said no because he had to go.  M.K. escorted his friend out and Meeks then asked M.K. for a ride.  M.K. agreed to give Meeks a ride and went to his room to change out of his work clothes, at which point he overheard a conversation between Wilkins and Meeks.  During the conversation, Wilkins and Meeks discussed which one of them should "go" with M.K.  Meeks asked Wilkins to "go" with M.K. because he "run[s] faster" than Meeks, but Wilkins refused.  Meeks then asked Wilkins where to find a lighter and Wilkins told him where to find one in the kitchen.  Meeks retrieved the lighter and left the house with M.K.  Meanwhile, Wilkins stayed behind and cleaned the garage.

M.K. and Meeks got into M.K.'s vehicle and Meeks directed M.K. to a fairly remote location near where Cervantes's body was discovered less than

an hour later. M.K. parked and Meeks exited the vehicle carrying a medium-sized nylon bag. Meeks ran towards the rear of the vehicle and M.K. lost sight of him in the darkness. Shortly after, M.K. saw a fire flare up in the distance and Meeks ran back to the vehicle, saying, " 'Drive, drive, drive, drive.' Let's go, go, go.' "

M.K. drove and Meeks directed him to a shopping center parking lot. M.K. parked and Meeks exited the vehicle to use a payphone, even though he had a cell phone. After a minute, Meeks returned to the vehicle and M.K. started to drive away. Meeks told M.K. to stop the vehicle and proceeded to throw his cell phone in a nearby dumpster. M.K. then drove himself and Meeks back to M.K. and Wilkins's residence. When they entered it, Meeks told Wilkins about lighting a fire and said, " 'I went around the back and tried to light it and it wouldn't light, so I went around the front and it lit real quick.' "

Later that night, Wilkins, Meeks, and M.K. went to a nightclub. On the way there, Meeks bragged to Wilkins and M.K. that he punched a guy during the fight that allegedly took place earlier that day and the guy was "a bleeder." At 3:00 or 4:00 a.m. the next morning, M.K. drove the group back from the club and dropped Meeks off at his residence. Afterwards, as M.K. drove himself and Wilkins back to their home, Wilkins told M.K. that, "when it was time," he would "tell [M.K.] what happened," and he "was trying to protect" M.K.

A month later, M.K. and Wilkins were alone together and Wilkins confessed what supposedly happened the night of the killing. According to M.K., Wilkins said a man was harassing Meeks or owed Meeks's family money. Meeks allegedly asked Wilkins to call the man and invite him over to Wilkins's residence under the guise that he needed construction work done.

6

However, Meeks actually intended to scare or attack the man. The man came to Wilkins's residence, Meeks hit him, and Wilkins and Meeks dragged the man into the garage. There, Wilkins held the man down and Meeks punched and hit him in his face and body. Thereafter, they put the victim inside his truck and drove off.[2]

e) *Phone Records*

Phone records show that, on March 8, 2007—the day of Cervantes's killing—a call was placed from Meeks's phone to Wilkins's phone at 6:13 p.m. At 6:28 p.m., a call was placed from Meeks's phone to M.K.'s phone. Both calls were transmitted from a cell tower near Wilkins's residence.

At 6:41 p.m., a call was placed from Wilkins's phone to Cervantes's phone. The call was transmitted from a cell tower near Wilkins's residence and received at a cell tower near Cervantes's residence.

At 6:48 p.m., a second call was placed from Meeks's phone to M.K.'s phone. The call was transmitted from a cell tower near Wilkins's residence.

At 7:18 p.m., a call was placed from Cervantes's phone to Wilkins's phone. The call was transmitted from, and received at, cell towers near Wilkins's residence.

At 8:18 p.m., a call was placed from Meeks's phone to Wilkins's phone. The call was transmitted from a cell tower near the location where Cervantes's body was recovered, and it was received at a cell tower near Wilkins's residence.

Between 9:05 and 9:06 p.m., three calls were placed from Meeks's phone to I.C.'s phone. All three calls were transmitted from a cell tower near

---

[2]    M.K.'s testimony concerning Wilkins's confession was heard by Wilkins's jury, but not Meeks's jury.

Wilkins's residence. At 9:06 p.m., a call was placed from I.C.'s phone to Meeks's phone.

Between 9:09 p.m. and 9:11 p.m., four calls were placed from I.C.'s phone to Cervantes's phone.

At 10:27 p.m., a call was placed from Meeks's phone to I.C.'s phone. The following morning, four additional calls were made from Meeks's phone to I.C.'s phone.

On March 10, 2007—the day I.C. purportedly received a call from an unknown caller about an envelope in her mailbox—a text message was sent from Wilkins's phone to Meeks's phone that read, "He got the package."

f) *Wilkins's Statements to Law Enforcement*

About a month after Cervantes's killing, Wilkins spoke with detectives from the sheriff's department. A videotaped recording of the interview was played for Wilkins's jury.

During the interview, Wilkins acknowledged he knew his coworker, I.C., but said he barely saw her. Wilkins initially denied knowing Cervantes and claimed he did not remember speaking with him the night of his death. However, he later said Cervantes was referred to him by a business partner to perform construction services. He said he called Cervantes and they spoke about the services Cervantes could provide him. He said he planned to schedule a meeting with Cervantes, but the men never set up a meeting and he never saw him.

Midway through the interview, Wilkins changed his story and admitted he was involved in Cervantes's killing. According to Wilkins, Meeks told him that Cervantes owed Meeks money and the two of them had a prior confrontation about money or a woman. Meeks and Wilkins hatched a plan whereby Wilkins would call Cervantes inquiring about construction services

8

and lure him to a location near Wilkins's residence, at which point Meeks would "do the rest." The plan called for Meeks to force Cervantes to sign away his property to his "next of kin." Meeks "knew the person that was going to get ... all of [Cervantes's] stuff ... if he died," and Meeks would receive at least some of the property from that person. Then, Meeks would "help [Wilkins] out" once he got "the stuff." Meeks and Wilkins discussed the plan "three or four times" before they executed it.

During the interview, Wilkins and one of the detectives had the following exchange while discussing the codefendants' plan:

"Detective: [Y]ou guys knew that uh, [Cervantes] wasn't going to be around when this was done? You know what I mean?

"Virgil [Wilkins]: Yeah.

"Detective: Pretty much, he's going to be, he's going to be dead, by the time [the next of kin [I.C.]] gets that letter.

"Virgil [Wilkins]: Probably, [Meeks], he told me um, he said, either he he'd go back to Mexico or ...

"Detective: Okay.

"Virgil [Wilkins]: ... or [inaudible]."

Wilkins further admitted that, on the night of Cervantes's killing, Wilkins called Cervantes and arranged a meeting near a fast food restaurant close to Wilkins's residence. Wilkins and Meeks walked to the meeting spot and Meeks hid in an alley. Meeks carried a sling bag containing duct tape and a premixed solution of flammable liquids. Cervantes arrived in his truck, Wilkins and Cervantes introduced themselves, and they starting walking towards Wilkins's residence. But, as they walked past Meeks's hiding spot, Meeks "jumped" Cervantes, struck him with an unknown object, choked him, and kicked him.

Wilkins retrieved duct tape from Meeks's bag and held Cervantes down while Meeks attacked him and tied him up with tape. Meeks emptied Cervantes's pockets of his keys and wallet and asked him for a code to his safe deposit box or home security alarm. As Cervantes laid on the ground bleeding and semi-conscious, Meeks took Cervantes's keys and got into the driver seat of his truck. Meeks told Wilkins to "get him up," so Wilkins picked up Cervantes and put him in the passenger seat. At this point, Cervantes was tied up, barely conscious, and no longer resisting. Meeks then drove off in the truck with Cervantes.

Wilkins covered up Cervantes's blood, returned home, and took a shower. Meeks later came back to Wilkins's residence and was breathing hard, as if he had been running. Meeks told Wilkins he got Cervantes to sign a letter disposing of his property. He also told Wilkins he burned Cervantes's truck. A short time later, M.K. arrived and the three men went to a nightclub for the evening. Wilkins told detectives that, prior to the attack, he did not know of Meeks's plan to burn Cervantes and he first learned about it when he saw the premixed solution of flammable liquids.

Law enforcement arrested Wilkins the day after his interview. During the ensuing search of Wilkins's residence, they recovered a newspaper article about Cervantes's killing hidden in Wilkins's dresser drawer underneath his clothing.

2. *Defense Case*

The defense called an expert witness on false confessions. He testified about law enforcement interrogation tactics and the circumstances under which they can cause a criminal suspect to make a false confession.

Wilkins's mother testified that the family's restaurant was in need of construction services.

### 3. *Judgment*

The juries found Wilkins guilty of the murder and arson charges and Meeks guilty of the murder charge. The trial court sentenced Wilkins to prison for 25 years 8 months to life and it sentenced Meeks to prison for 25 years to life.

On direct appeal, this court affirmed the defendants' judgments of conviction and the Supreme Court denied review. (*People v. Meeks* (Sept. 7, 2010, D057193) [nonpub. opn.], review den., Dec. 15, 2010, S187238.)

### B. *Senate Bill No. 1437*

After Wilkins's judgment became final, the Legislature approved Senate Bill No. 1437, which went into effect January 1, 2019. Senate Bill No. 1437 "significantly limited the scope of the felony-murder rule and eliminated liability for murder under the natural and probable consequences doctrine through two key provisions. [Citations.] First, Senate Bill 1437 amended section 189 so that '[d]efendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were "major participant[s] in the underlying felony and acted with reckless indifference to human life." ' [Citation.] Second, it amended section 188 to provide that when the felony-murder rule does not apply, a principal in the crime of murder can only be convicted where they acted 'with malice aforethought,' and '[m]alice shall not be imputed to a person based solely on his or her participation in a crime.' " (*People v. Trent* (2023) 96 Cal.App.5th 33, 38–39.)

Senate Bill No. 1437 also created a procedure, now codified in section 1172.6, which allows persons convicted of felony murder or natural and probable consequences murder under the former murder laws to petition for retroactive relief under the amended murder laws. (Stats. 2018, ch. 1015,

11

§ 4.) A petitioner initiates the process by filing a declaration averring that: (1) a charging document was filed against the petitioner allowing the prosecution to proceed under a theory of felony murder or natural and probable consequences murder; (2) the petitioner was convicted of murder after a trial or accepted a plea offer at which the petitioner could have been convicted of murder; and (3) the petitioner could not presently be convicted of murder because of the changes to the murder laws that were implemented by Senate Bill No. 1437. (§ 1172.6, subds. (a)(1)–(3), (b)(1).) If the petitioner states a prima facie case for relief, the court must issue an order to show cause and, in most cases, schedule an evidentiary hearing to determine whether to vacate the murder conviction, recall the sentence, and resentence the petitioner on any remaining counts. (*Id.*, subds. (c), (d)(1).)

At the evidentiary hearing, the prosecution bears the burden of proving, beyond a reasonable doubt, that the petitioner is guilty of murder under the amended murder laws. (§ 1172.6, subd. (d)(3).) "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion." (*Ibid.*) The parties may offer new evidence or evidence in addition to that which was considered at the murder trial as well. (*Ibid.*) "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (*Ibid.*)

12

C. *Procedural Background*

Wilkins filed a petition to have his first degree murder conviction vacated and to be resentenced under section 1172.6. The trial court appointed counsel to represent Wilkins in the resentencing proceeding. Thereafter, the court found section 1172.6 unconstitutional and struck Wilkins's petition. However, on appeal, our court determined that section 1172.6 is constitutional and we therefore reversed the order striking Wilkins's petition. (*People v. Wilkins* (2021) 68 Cal.App.5th 153.)

On remand, the trial court set the matter for an evidentiary hearing. At the hearing, the court took judicial notice of the entire trial record.

Wilkins also testified at the evidentiary hearing and told the following version of events about the night of Cervantes's killing. At about 5:00 p.m., Meeks and his daughter showed up at Wilkins's residence. Wilkins needed construction work done for one of his side businesses, so Meeks gave him Cervantes's phone number and recommended that he call him. Wilkins called Cervantes, they discussed the scope of the construction project, and Wilkins invited Cervantes over to his residence that night. Wilkins and Cervantes met at a parking lot near Wilkins's residence, walked over to his residence, and started discussing the construction project. About five minutes later, Meeks entered the room holding a gun. Meeks threatened, grabbed, hit, and kicked Cervantes. The fight moved into the garage, where Meeks continued to assault Cervantes. Wilkins told them to leave and Meeks escorted Cervantes out of the home at gunpoint. Meeks got into the driver seat of Cervantes's truck, Cervantes got into the truck as well, and the two of them drove off. About 10 or 15 minutes later, Meeks called Wilkins and asked him to pick him up. Wilkins drove over, picked up Meeks from the side of the road about two minutes away, and returned home. He did not see

Cervantes or his truck and he did not ask Meeks what happened to them. Later that evening, Meeks asked M.K. for a ride, retrieved a lighter, left the residence with M.K., and returned 20 or 25 minutes later.

After the evidentiary hearing, the trial court denied Wilkins's petition for resentencing. The court found Wilkins "shared the codefendant's intent to kill. He participated in the planning, participated in luring the victim to the ambush, participated in the beating of the victim, and then participated in disposing of the victim's body and the covering up of the crime in the hopes that he would receive some sort of compensation." Thus, the court concluded that the prosecution proved Wilkins was guilty of directly aiding and abetting either willful, deliberate, and premeditated murder or lying-in-wait murder.

## III

## DISCUSSION

Wilkins appeals the order denying his resentencing petition. He claims the evidence is insufficient to support the court's finding that he is guilty of murder under the murder statutes presently in effect.

A. *Legal Standards*

"We review the trial court's factfinding on the question of whether a defendant committed a murder under a still-valid theory for substantial evidence. [Citation.] We analyze the record in the light most favorable to the trial court's finding and determine if there is sufficient substantial evidence to find the defendant guilty beyond a reasonable doubt. [Citations.] 'Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational

14

fact finder's findings beyond a reasonable doubt.' [Citation.] We will not reverse unless there is no hypothesis upon which sufficient substantial evidence exists to support the trial court's decision. [Citation.] We must 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] 'The same standard applies when the conviction rests primarily on circumstantial evidence.' [Citation.] 'An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence.' " (*People v. Didyavong* (2023) 90 Cal.App.5th 85, 97.)

B. *Application*

The trial court found Wilkins guilty of murder as a direct aider and abettor of willful, deliberate, and premediated murder and lying-in-wait murder. We begin our analysis with a discussion of Wilkins's liability as an aider and abettor of willful, deliberate, and premediated murder.

"Murder is the unlawful killing of a human being … with malice aforethought." (§ 187, subd. (a).) Murder that is "willful, deliberate, and premeditated" is first degree murder. (§ 189, subd. (a).) " ' " '[P]remeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " ' [Citation.] ' "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." ' " (*People v. Potts* (2019) 6 Cal.5th 1012, 1027.)

"All persons concerned in the commission of a crime, … whether they directly commit the act constituting the offense, or aid and abet in its commission, … are principals in any crime so committed." (§ 31.) "For a defendant to be liable as a direct aider and abettor, 'the prosecution must

15

show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission.' " (*In re Lopez* (2023) 14 Cal.5th 562, 579.) "Thus, proof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.)

Wilkins does not challenge the trial court's finding that Meeks (the direct perpetrator) committed the willful, deliberate, and premediated first degree murder of Cervantes, nor does he challenge the court's finding that he aided Meeks in committing the killing of Cervantes. Rather, Wilkins challenges the court's finding that he harbored the requisite mens rea necessary to be found guilty as a direct aider and abettor—i.e., the court's finding that he knew of Meeks's unlawful intent to kill and intended to facilitate the killing. As we will explain, there was ample evidence to sustain the court's finding that Wilkins knew about Meeks's plan to kill Cervantes and intended to assist him in achieving the unlawful ends of his plan.

During his interview with detectives, Wilkins discussed the defendants' preconceived plan to obtain property from Cervantes. According to Wilkins, the plan called for Meeks to persuade or force Cervantes to sign a letter giving away his property rights to his "next of kin" if he "died," a person who would then transfer at least some of the property to Meeks. The singular fact the defendants' plan contemplated a transfer of property to Cervantes's "next of kin" upon his death is, at the very least, strong circumstantial evidence

16

that Wilkins knew of, and intended to aid, Meeks in killing Cervantes. Indeed, when the detectives asked Wilkins whether Cervantes was "going to be dead by the time [his next of kin] gets [the] letter," Wilkins said, "Probably."

Wilkins's admissions about the attack itself bolster the trial court's finding that Wilkins knew about and intended to further Meek's plan to kill. According to Wilkins, he called Cervantes under the pretense that he needed construction services, lured him to an isolated location at night, and distracted him until Meeks emerged from his place of hiding and attacked him. As Meeks choked, kicked, and struck Cervantes, Wilkins retrieved duct tape from Meeks's bag—a bag that also contained a premixed solution of flammable liquids. By Wilkins's admission, Wilkins learned about Meeks's plan to burn Cervantes when he saw the solution. Wilkins's combined admissions that he learned about Meeks's plan to burn Cervantes when he saw the solution, and that he had access to the bag with the solution midway during the attack, tend to establish that Wilkins saw the solution and learned about the plan to burn Cervantes *while the attack was ongoing*. Nonetheless, Wilkins continued to aid Meeks by holding Cervantes down and passing Meeks the duct tape to tie up their defenseless victim.

Finally, Wilkins's statements concerning Cervantes's critical condition at the culmination of the attack add further support to the court's mens rea findings. According to Wilkins, Cervantes was bleeding heavily and semi-conscious after Meeks attacked him. Notwithstanding Cervantes's grave condition, Wilkins proceeded to carry Cervantes into his truck so that Meeks—a man with a known vendetta against Cervantes—could drive off with Cervantes and "do the rest." A reasonable trier of fact could conclude that Wilkins's continued efforts to aid Meeks established that he did not

17

merely intend to aid in assaulting Cervantes—something the defendants had already accomplished by the time Wilkins loaded the incapacitated, bleeding Cervantes into the truck with Meeks. Under these circumstances, a fact finder could rationally find that Wilkins had knowledge of, and an intent to promote, Meeks's plan to kill.[3]

IV

DISPOSITION

The order is affirmed.

McCONNELL, P. J.

WE CONCUR:


O'ROURKE, J.


IRION, J.

---

[3] Given our conclusion that substantial evidence supports the court's finding that Wilkins is guilty of murder as a direct aider and abettor of willful, deliberate, and premediated murder, it is unnecessary for us to decide whether sufficient evidence supports the court's alternative finding that he is guilty of murder as a direct aider and abettor of lying-in-wait murder.