Filed 5/13/26  P. v. Langlois CA3

<u>NOT TO BE PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| THE PEOPLE,<br>        Plaintiff and Respondent,<br><br>        v.<br><br>CHRISTOPHER LAWRENCE LANGLOIS,<br>        Defendant and Appellant. | C102671<br><br>(Super. Ct. No. 13F00224) |

Defendant Christopher Lawrence Langlois appeals the trial court's denial of his request for resentencing following an evidentiary hearing pursuant to Penal Code section 1172.6, subdivision (d) (statutory section citations that follow are to the Penal Code).  He contends insufficient evidence supports the trial court's determination that he aided and abetted implied malice murder.  Specifically, he complains there is no evidence that he knew codefendant Jeffery Powell was armed with a knife and that his codefendant intended to stab the victim.  Defendant, therefore, requests reversal and remand for resentencing.  We affirm the trial court's order.

FACTS AND HISTORY OF THE PROCEEDINGS

In 2015, a jury found defendant and codefendant Powell guilty of second degree murder (§ 187) and first degree burglary (§ 459).  The jury also found true the allegation that Powell personally used a knife to commit the murder (§ 12022, subd. (b)(1)).

1

(*People v. Powell* (2021) 63 Cal.App.5th 689, 692.)  The trial court sentenced defendant to 15 years to life, and we upheld this judgment on appeal.  (*Ibid.*)

In December 2021, defendant filed a petition for resentencing pursuant to former section 1170.95 (now section 1172.6).  The People's initial response conceded defendant had stated a prima facie case necessitating an evidentiary hearing wherein the People intended to show he was still guilty of murder.  Consistent with this concession, the trial court issued an order to show cause.

Thereafter, the People's prehearing brief argued defendant was still liable for second degree murder because he directly aided and abetted implied malice murder.  Defendant disagreed arguing the trial record did not establish that he aided and abetted implied malice murder.  Specifically, defendant argued the trial record did not establish he knew Powell was armed with a knife or that he intended to aid in Powell's life endangering act.  Accordingly, defendant asked to be resentenced to the target offense of assault by means of force likely to cause great bodily injury (§ 245, subd. (a)(4)).

### The Evidentiary Hearing

The evidentiary hearing took place over a period of months, culminating in the trial court's decision in October 2024.  At the first hearing in May 2024, the trial court admitted the original trial transcripts subject to any evidence that might be excluded by evidentiary objection.  The People rested their case in chief on this evidence.

### The Trial Evidence

A.J. testified against defendant and Powell pursuant to a cooperation agreement following A.J.'s guilty plea to murder.  J.P. and T.B. were granted use immunity.  The evening of January 4, 2013, A.J., Powell, and W.B. were out drinking together.  Powell and W.B. picked up women, and A.J. was dropped off by the group so that he could visit one of his cousins while the others went to a local hotel.  They left him at a convenience store.  A.J. left his phone charging at the store and walked to his cousin's home.  No one

2

was awake there, and A.J. headed back towards the store. At approximately 3:00 a.m., the victim's son James S. saw A.J. walking through the neighborhood and thought he might be the person responsible for recent thefts in the area. They talked to each other, and James S. offered A.J. marijuana. A disagreement broke out and punches were thrown, but none landed. A.J. fled threatening he would be back.

James S. followed A.J. to the convenience store, went home to retrieve brass knuckles, and then returned confronting A.J. about his threat. They fought, first with name calling, but ultimately James S. hit A.J. with the brass knuckles. T.B., saw the altercation at the convenience store and tried to stop the fight, pulling out a Swiss pocketknife. James S. fled, returned home, and warned his father about what had happened. His father told James S. to go to bed and fell asleep on the couch.

In the interim, A.J. awoke in a pool of blood, and T.B. agreed to give A.J. a ride in exchange for gas money. A.J. called Powell and said he was beaten by a group with brass knuckles. Powell assured him, "Don't worry. We'll handle it—come get me." A.J. first showed T.B the house where James S. lived. T.B then drove A.J. to Powell's hotel. A.J.'s "head was really split open really bad." T.B. then drove them to Powell's apartment. Powell changed clothes and retrieved plastic gloves and methamphetamine. The three then picked up defendant who brought along J.P. as his backup. Defendant told J.P. that A.J. was jumped by a group of guys, and they were headed to deal with it. A.J. wanted revenge, and the five headed to James S.'s house. T.B. parked, and everyone but T.B. got out. They told her to wait in the car and keep the engine running.

The group stood outside for some period of time before A.J. said, "Fuck it," ran up to the house, and kicked in the front door. A.J. slipped, and Powell (who was wearing the gloves) entered with defendant and immediately started attacking the man asleep on the couch. The only light in the room came from the television. J.P. saw the victim on all fours with A.J. and Powell attacking him. J.P. heard the victim making dying, grunting noises. A.J. saw Powell and defendant punching the victim on the ground. Both the

3

victim and Powell suffered stab wounds.  Defendant picked up a coffee table and either hit the victim with it or dropped it on top of him.  The victim may have been punched a few more times and then they left.  In the interim, the victim lunged at A.J.

The group returned to the car and fled.  A.J., Powell, and defendant were bloody and some of that blood transferred to T.B.'s car.  Powell had a stab wound on his leg and a cut on his hand.  J.P. later disposed of their bloody clothes.  Both A.J. and J.P. denied seeing any weapons before or during the attack.  However, J.P. believed based on the timing of the attack that Powell brought the knife with him.  A.J. saw Powell hand defendant a black-handled knife once they were back in the car, and J.P. heard Powell say he threw a knife in the bushes.  Later efforts to recover the knife were unsuccessful because the police were present.

James S. had heard a "big bang" followed by a succession of banging noises.  He found his father alone, bleeding in the living room.  His father exclaimed, "[T]hey got me" and died before paramedics arrived.  The victim suffered stab wounds to the chest, armpit, and upper arm, which could have been caused by a missing steak knife.  He also suffered numerous blunt injuries causing bruising and scrapes on his face, forearms, wrists, hand, lower leg, feet and back.  The cause of death was a stab wound to the heart.  James S. told authorities one of the victim's favorite steak knives was missing, although he could not say when it had disappeared, and the knife was not used at dinner the night before.  The forensic pathologist examined another steak knife from the set and opined the knife could have caused the victim's injuries.  Despite several searches of the area, the murder weapon was never recovered.

Finally, according to statements recorded by Detective Shaun Gualco that were admitted into evidence to impeach C.L.'s testimony, defendant told C.L. he had "fucked up because he was the last person that touched" something, and he was worried his fingerprints were on it.  Gualco asked about C.L. previously telling another investigator about a knife with defendant's fingerprints.  C.L. responded, "Well, he thinks it is."  She

4

told Gualco, "Because he said … when the other person kept grabbing him or whatever, and before he could … get him off of him, like he tried to see if the guy was okay, and he pulled the knife out, and he said that by then, … it was too late." She said defendant did not say what he did with the knife or who had stabbed the victim. C.L. later clarified that defendant "never said he pulled it out. He said he took it off of him" and "the only reason I thought it was a knife is because that's what the other agent [said]." (Italics omitted.) Defendant went on the run because he was scared and did not want to go to jail. Defendant was diagnosed with a boxer's fracture of the hand on February 2, 2013. The injury was one to four weeks old.

    The Live Testimony Given at the Evidentiary Hearing

Defendant presented the live testimony of his codefendant Powell who had recently been granted parole. Powell started by apologizing to the court for lying the last time he testified and admitting he killed the victim by personally stabbing him to death. Powell's introspection derived from his rehabilitative efforts while incarcerated that motivated him to tell the truth. Powell had known A.J. and defendant since high school. He also exchanged letters with defendant following his conviction for murder but denied he would lie for him.

A.J. called Powell around 3:00 a.m. reporting he had been jumped, and Powell told A.J. to come to him so that they could "deal with it." A.J.'s face was split open with skin flapping from his forehead to his nose. They agreed to get revenge.

The group stopped at Powell's house to grab methamphetamine, a kitchen knife, and rubber gloves. Powell brought the knife because A.J. had been attacked with brass knuckles. Powell denied telling A.J. about the knife, calling it a "spur-of-the-moment" decision. Powell "stuffed" the knife in his back pocket. Earlier Powell had called defendant to tell him he was stopping to get drugs, but Powell denied telling defendant

5

about the knife. Powell and A.J. did methamphetamine in the car while directing T.B. where to go.

When they picked up defendant, Powell told him about what had happened to A.J., and the group agreed to go to the victim's home. The plan was to get into a fight to retaliate for what had happened, and Powell asked defendant to come along to make sure they would not be outnumbered. Defendant was coming along to get involved if necessary. J.P. introduced himself as a skinhead and came along to protect defendant's back. Powell denied telling anyone about the knife in his pocket or showing it to anyone.

On the drive to the victim's house, everyone used methamphetamine. Everyone but the driver got out. Powell was expecting an open garage with a house party going on, but it looked like everyone was sleeping. A.J. elected to kick in the door, and the group followed him. They walked up the driveway, and Powell armed himself with the knife following A.J. When A.J. stumbled, Powell proceeded past him and attacked the person he saw getting up from the couch. Powell stabbed him two or three times. He turned to leave and saw A.J. enter the house. Powell turned back around and stabbed the victim another two or three times. Powell denied seeing defendant do anything. Powell turned to flee and ran into A.J. Defendant and J.P. were in the doorway, and Powell denied seeing defendant punch the victim. They followed him back to the car, and Powell threw the knife in some bushes as he waited for A.J. to arrive at the car. Powell estimated that A.J. was in the house 30 seconds longer than the rest of them. Powell estimated the entire event from entering the house to being back in the car took approximately 90 seconds.

Powell denied telling anyone that he had stabbed the victim, that there was a conversation about the victim being stabbed, or that anyone else knew he had been stabbed. Powell had stabbed himself during the attack but did not realize how badly until later. J.P. told him to get out of his bloody clothes, and defendant got him some clothes to put on. Powell told A.J. about the knife and asked him to go get it since he was the

6

reason Powell went there. A.J. tried but could not find the knife. Powell sutured the wound on his leg with fishing line.

On cross-examination, Powell admitted he intended to exact revenge for A.J. by causing as much physical damage to the victim as possible "up to and including killing him." He took the knife out of his pocket at the corner of the garage on the way to the front door of the victim's home. Powell held the knife in his hand as he followed A.J., and defendant followed him. Powell immediately started stabbing upon entry. Powell denied giving the knife to anyone and professed he was the only person to have touched the knife that day. Powell was motivated by loyalty and a desire to prove himself to his friends, including defendant. He believed that violence should be met with equal or greater violence, and A.J. had skin flapping on his face from a violent encounter with a group of individuals armed with brass knuckles. He therefore retrieved a knife and gloves from his house, but he could not recall whether he used the gloves even though he brought them to make sure he would not leave fingerprints or DNA.

Powell's history of violence and thievery started in childhood and continued into his prison commitment. Powell called defendant to help him obtain violent retribution. He contemplated a violent assault when he went to his home and retrieved the knife and gloves. He did not recall whether anyone knew about the gloves. This was the first fight of his 10 to 20 lifetime fights that he brought gloves to.

Powell admitted he would have lied to protect his friends in 2012 and lied more than 50 times at trial about numerous details concerning the crime in an attempt to avoid being convicted of murder. He felt partially responsible for defendant being in prison and wanted him to be able to go home.

The Trial Court's Oral Ruling

Following extensive argument of the parties, the trial court's review of the trial record and testimony presented at the evidentiary hearing, and a recitation of the standard

to be employed, the trial court found the People had established defendant was guilty of implied malice murder as an aider and abettor and denied the petition. In so doing, the court extensively described the facts supporting this determination. In relevant part given the issues on appeal, the court found that defendant aided and abetted the life endangering act of Powell stabbing the victim. Defendant "actively participated," knew "there was a knife involved," and was aware that "the activities carried a grave risk of death."

The court identified numerous facts supporting these conclusions. Powell testified that he grabbed drugs, gloves, and a knife at his apartment. Powell, defendant, and A.J. converged on the victim immediately after the door was kicked in. They immediately assaulted him. Defendant hit the victim with enough force to fracture his hand. Either Powell brought the knife or Powell got the knife from the victim. Powell repeatedly stabbed the victim. Powell was himself stabbed, suggesting the victim had the knife at some point. Defendant told his girlfriend that his fingerprints would be on something incriminating, and there is evidence that he either pulled the knife out of the victim or took the knife away from him. The victim made dying noises that would have been heard by all. Defendant did nothing to render aid and instead hit the victim with a coffee table. Further, this was a planned assault seeking violent retribution against the victim who was innocently sleeping inside his home. Thereafter, the group calmly retreated to the car, disposed of the knife and incriminating bloody clothing, and then defendant fled showing "consciousness of guilt."

Defendant timely appealed.

### DISCUSSION

Starting in 2019, the Legislature amended the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder. (*People v. Lewis* (2021) 11 Cal.5th 952, 959.) It did this by amending section 188, which defines malice,

8

and section 189, the felony-murder statute. (*Lewis*, at p. 959; *People v. Curiel* (2023) 15 Cal.5th 433, 448-449.) The Legislature also created a procedure in what is now section 1172.6 that allows those previously convicted of felony murder or murder under the natural and probable consequences doctrine to obtain relief from their convictions if they could not be convicted of murder under the amended law. (*Curiel*, at p. 449; accord, *Lewis*, at p. 957.) Subsequently, the Legislature codified aspects of the *Lewis* decision and clarified the burden of proof and procedure at the evidentiary hearing stage of the proceedings. (Stats. 2021, ch. 551.)

Here, we are concerned with the evidentiary hearing that occurs after the trial court has determined a defendant set forth a prima facie case for relief. (§ 1172.6, subds. (a), (c), (d); *People v. Strong* (2022) 13 Cal.5th 698, 708.) At that hearing, the prosecution bears the burden of proving beyond a reasonable doubt the defendant is guilty of murder under the amended law. (§ 1172.6, subd. (d)(3).) Both parties may, but are not required to, present "new or additional evidence to meet their respective burdens." (*Ibid*.; see *People v. Njoku* (2023) 95 Cal.App.5th 27, 43-46.) Moreover, "the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed." (§ 1172.6, subd. (d)(3).) If the court finds beyond a reasonable doubt the defendant is guilty of murder under a theory that remains valid after the amendments to sections 188 and 189, the petition is denied. (§ 1172.6, subd. (d)(3).)

Defendant argues substantial evidence does not support the trial court's determination he aided and abetted implied malice murder. Specifically, he challenges the showing of his mens rea asserting "there was insufficient evidence to show [he] knew Powell had a knife or that Powell intended to stab the victim with a knife during the assault."

Under the substantial evidence standard, "we review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial

evidence—that is, evidence [that] is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988.)

"Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) " ' "If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." ' " (*People v. Sifuentes* (2022) 83 Cal.App.5th 217, 233.) Reversal is not warranted unless " ' "upon no hypothesis whatever is there sufficient substantial evidence to support [the trial court's ruling]." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

"[S]econd degree murder . . . is 'the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.] . . . 'Malice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his [or her or their] conduct endangers the life of another and who acts with conscious disregard for life.' " [Citation.] In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another.' " (*People v. Cravens*, *supra*, 53 Cal.4th at p. 507.)

"[U]nder direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in

10

achieving those unlawful ends.' " (*People v. Gentile* (2020) 10 Cal.5th 830, 843, quoting *People v. Perez* (2005) 35 Cal.4th 1219, 1225.) " '[T]o be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' " (*People v. Reyes*, *supra*, 14 Cal.5th at p. 991.)

Here, there was sufficient evidence to support the trial court's conclusion that defendant knew Powell was armed with the knife and intended to stab the victim. The group was formed for their propensity for violence and assembled that evening to exact revenge for A.J.'s savage beating by a group of individuals with brass knuckles. Defendant was specifically recruited to have Powell's back. Powell brought a knife and rubber gloves from his apartment and intended to do as much, if not more damage than had been done to A.J.—"up to and including killing" the victim. Putting aside Powell's dubious statement that he "stuffed" a kitchen knife in his back pocket and did not tell anyone he had it, Powell was wearing gloves and put the knife in his hand in the victim's driveway where defendant followed directly behind. This allows a reasonable inference that defendant, if he had not been previously informed, learned that Powell was armed with a knife before they entered the home. A.J. then kicked down the door, and Powell immediately started stabbing the victim. At some point, Powell was also stabbed. Defendant was next to Powell, punching the victim and fracturing his hand in the process. From this we may infer that defendant was attacking the victim while Powell was stabbing him. Defendant confided to his girlfriend that he struggled with the victim, who was grabbing him. Defendant either took the knife from the victim or pulled it out of him. Defendant was worried his fingerprints would be on "it." Thus it is clear that defendant tussled with the victim during the attack and in the process handled the knife.

11

Finally, underscoring his intent to aid Powell rather than helping the victim who was making noises like he was dying, defendant either hit the victim with or threw a table on him before they fled.

Defendant faults the trial court for finding defendant "was aware there was a knife at some point," but it is clear from the context of the court's statement and the evidence presented that the court determined defendant knew of the knife during the stabbing, if not before, and acted to assist Powell in the knife attack by being present during the home invasion, punching and tussling with the victim while he was being stabbed, and finally, attacking the victim with a table further incapacitating him so that they could escape unimpeded. Accordingly, defendant has not shown an insufficiency of evidence supporting the trial court's ruling.

DISPOSITION

The judgment is affirmed.

/s/
HULL, J.

We concur:

/s/
EARL, P. J.

/s/
MESIWALA, J.